### M-B-K DRILLING CO., Inc. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 4354.

#### United States Court of Appeals Tenth Circuit.

#### Feb. 12, 1952.

C. D. Ellison, Oklahoma City, Okl., for petitioner.

R. D. Harrison, Washington, D. C. (Ellis N. Slack, Acting Asst. Atty. Gen., Helen Goodner and Morton K. Rothschild, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

This is a petition to review a decision of the Tax Court. It involves income tax liability of the M-B-K Drilling Co., Inc.,[1] for the fiscal year ending June 30, 1946.

On June 10, 1939, York & Harper, Inc.,[2] and The Sloan & Zook Company[3] were owners of certain oil and gas leases situated in Ector County, Texas. On that date Sloan & Zook entered into a contract with York & Harper by which the latter agreed to develop and operate such leases.

On June 20, 1939, York & Harper entered into a contract with the Drilling Company, whereby the latter agreed to drill certain wells on the leases and to operate wells theretofore drilled and thereafter to be drilled on such leases. In the contract the

1. Hereinafter called the Drilling Company.
2. Hereinafter called York & Harper.
3. Hereinafter called Sloan & Zook.

leases were referred to as Lease A, Lease B, Lease C and Lease D. Under the contract the Drilling Company agreed to drill promptly all offset wells required from time to time to protect the leases from offset drainage and to drill additional wells upon the leases at locations selected by York & Harper, at such times as the latter should designate, so as to ultimately accomplish the complete development of the leases in accordance with the contract of York & Harper with Sloan & Zook and "to handle the operation of the wells" then existing on Leases A and B and all wells drilled under the contract upon Leases A, B, C and D.

York & Harper agreed that upon the completion of each well drilled under the contract it would pay the Drilling Company "for the drilling of such well at the prevailing rate in the field at the date of such completion for similar work performed by independent contractors" and that payment by York & Harper to the Drilling Company "of the contract price for each such well drilled" should be made in the manner set forth in the contract. The contract provided that upon the completion of each well York & Harper should pay the Drilling Company its actual cash outlay incurred in the drilling of such well; that the difference between "the contract price of each well" and the actual cash outlay incurred by the Drilling Company in the drilling of such well should be set up on the books of the Drilling Company as a "deferred account payable," to be paid by York & Harper to the Drilling Company after the properties had been fully developed and "when all liens, encumbrances and charges against the four leases * * * have been fully paid and retired, and when all advancements made by Operator (York & Harper) in connection with the development, equipment and operation of said properties have been fully repaid so that said properties out of production have entirely retired and discharged all items of cost and expense chargeable to the properties for development, equipment and operation." It further provided that "When

the four leases * * * have been fully paid out, the difference between the contract price and actual cash cost to Contractor (the Drilling Company) of all wells then drilled shall be paid to Contractor [4] by Operator in a series of monthly payments, each such payment to be in an amount not less than fifty percent of Operator's net income from the four leases above described, the first of such payments to be made the 20th day of the first month following the complete payout of the properties and a similar payment to be made the 20th day of each month thereafter until Operator's account payable to Contractor is fully discharged."

Under the contract York & Harper also agreed to assign to the Drilling Company "an undivided one-eighth ($\frac{1}{8}$) interest" in Leases A, B, C, and D, and that York & Harper should receive the proceeds of such $\frac{1}{8}$ working interest until the leases were fully paid out, and that thereafter the Drilling Company should receive the proceeds of such $\frac{1}{8}$ "working interest production" from such leases.

On June 30, 1940, the Drilling Company had completed its drilling obligations under the contract and had set up on its books an item of $124,241.72 in its ledger under the heading "York and Harper, Inc. * * 'B' and * * * 'D' Leases, Drilling Accounts Receivable Out of Oil."

A controversy arose between York & Harper and the Drilling Company with respect to the amount and time of payment of the deferred payment. On May 17, 1945, a compromise agreement was entered into between York & Harper and the Drilling Company, which recited that in order to settle the controversy which had arisen between them with respect to the amount and time of payment of the deferred payment, they agreed that on July 20, 1945, "all the terms as to time when" the Drilling Company would become "entitled to the deferred" payment would be met and that York & Harper would, on July 20, 1945, pay to the Drilling Company $31,060.43, "in full settlement" of all rights, claims or

---

4. The amount of such difference to be paid the Drilling Company is hereinafter referred to as the deferred payment.

demands of the Drilling Company with respect to such deferred payment.

On July 20, 1945, York & Harper paid the Drilling Company $31,060.43. In its income tax return for the year ending June 30, 1946, the Drilling Company reported such income as a long term capital gain. The Commissioner held that such income was ordinary income, determined a deficiency accordingly and duly notified the Drilling Company of such deficiency. The Tax Court sustained the determination of the Commissioner and decided that there was an income tax deficiency for the year ending June 30, 1946, of $4,927.03 and no deficiency in excess profits tax for such year.

The Drilling Company kept its books and filed its income tax returns on an accrual basis.

The Drilling Company was dissolved October 31, 1947. In the proceeding before the Tax Court Roeser & Pendleton, Inc., Kerr-McGee Oil Industries, Inc. and Big Chief Drilling Co. admitted that they were liable, under § 311 of the Internal Revenue Code, as transferees of the Drilling Company, for any taxes due from the Drilling Company for the fiscal year ending June 30, 1946.

The contention of the Drilling Company, as we understand it, is that it acquired, under the contract of June 20, 1939, an interest in one-half of York & Harper's share of the oil remaining in place after the leases had been fully paid out with the proceeds of oil produced therefrom; that the interest of the Drilling Company so acquired was that amount of oil in place, which, when produced and sold, would produce net proceeds equal to the amount of the deferred payment; and that when it compromised its claim for the deferred payment it, in effect, sold its interest in the oil in place for $31,060.43.

The Drilling Company relies upon Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, and Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324. In Burton-Sutton Oil Co. v. Commissioner, supra, the Cameron Parish School Board, as lessor, entered into an oil and gas lease with S. W. Sweeney,

as lessee, covering certain lands in Louisiana. The school board retained an underlying royalty. Sweeney transferred his interest in the lease to the Gulf Refining Co. of Louisiana, reserving an overriding royalty. Gulf entered into a contract with J. G. Sutton, by which it sold, conveyed and transferred to Sutton all its working interest in the lease and by which Sutton agreed to pay to Gulf 50 per cent of the net proceeds derived from the production and sale of working interest oil. The Burton-Sutton Oil Co. acquired the interest of J. G. Sutton under such contract. The Court held that Gulf, before it entered into the contract with Sutton, had an economic interest in the oil in place, and that under its contract with Sutton it reserved a part of such interest, to-wit, 50 per cent of the net proceeds derived from working interest oil. In Thomas v. Perkins, supra, Hammonds and Branson owned oil and gas leases on undeveloped lands in Texas, which reserved a ⅛ royalty to the lessor. They assigned such leases to the Faith Oil Company. In taking the assignment the Faith Company acted for itself to the extent of ¼ and for J. P. Perkins and one Green to the extent of ⅜ each. Later the Faith Company transferred its interest to Perkins.

The assignment recited that in consideration of $10 in cash and $395,000 "to be paid out of the oil produced and saved from the * * * lands, and to be ¼ of all the oil produced and saved * * * until the full sum" should be paid, Hammonds and Branson transferred to the Faith Company all their right, title and interest in and to the leases and rights thereunder. It provided that the $395,000 should be payable only out of oil, if, as and when produced from the land, and that there should be no personal obligation on the part of the assignee, its successors or assigns. The court held that it was the intention of the parties to withhold from the operation of the grant ¼ of the oil to be produced and saved up to an amount sufficient when sold to yield the sum of $395,000, and that the oil payments made to the assignors under the assignment were not chargeable to Perkins as part of his gross income.

In such cases the working interest, under the leases, was vested in the grantor or assignor and in transferring such working interest the grantor or assignor reserved or withheld from the operation of the grant or assignment a portion of the oil. To make the doctrine of such cases applicable here, we would have to hold that by the contract of June 20, 1939, York & Harper granted or assigned to the Drilling Company a portion of their share of the working interest under such leases. Moreover, the $31,060.43 would not be capital gain unless we further held that by the compromise contract of May 17, 1945, the Drilling Company transferred to York & Harper a portion of the working interest under such leases.

It is significant that neither the contract of June 20, 1939, nor the contract of May 17, 1945, contains any words of bargain, sale, grant, transfer or assignment. Moreover, the contract of June 20, 1939, does not contain any language manifesting an intent of the parties thereto that the Drilling Company should acquire thereunder any part of the working interest of York & Harper under the leases; and the contract of May 17, 1945, does not contain any language manifesting an intent of the parties that it should operate as a transfer by the Drilling Company to York & Harper of any claim in the working interest under the leases.

The contract of June 20, 1939, provided that the deferred payment should be treated as a "deferred account payable."

We are of the opinion that the contract of June 20, 1939, when considered in its entirety, manifests not an intent to transfer to the Drilling Company any part of York & Harper's working interest under the leases, but merely an intent to contingently obligate York & Harper to pay the Drilling Company the amount of the deferred payment as additional consideration for the drilling of the wells. The obligation to pay the deferred payments was contingent upon the leases paying out. The obligation to pay a monthly installment on the 20th day of the month following the payout of the leases and on the 20th day of each month thereafter was contingent on York & Harper receiving net income from the leases during the preceding month, but the latter contingency merely fixed the minimum of each monthly payment. The contract did not in terms make the monthly installments payable out of net income. York & Harper, at its election, could pay the whole or any part of the deferred payment on the 20th day of any month after the leases paid out, regardless of whether or not it had received net income from the leases during the preceding month. Moreover, we think the parties reasonably assumed and contemplated that if the leases paid out, one-half of the net income thereafter realized by York & Harper from the leases would be sufficient, over a period, to discharge the deferred payment in monthly installments.

The Drilling Company, at no time, in its income tax returns for the years prior to the year ending June 30, 1946, treated the contract of June 20, 1939, as having vested in it an interest in any part of York & Harper's working interest under the leases. Rather, it treated the contract as creating a contingent right to receive the deferred payment as additional compensation for drilling the wells.

We conclude that the contract of June 20, 1939, created a contingent obligation on the part of York & Harper to pay the Drilling Company an additional amount for the services rendered in drilling the wells under the contract and did not transfer to the Drilling Company any part of York & Harper's working interest under the leases. It follows that the Drilling Company received under the compromise agreement monies for services rendered, which constituted ordinary income.[5]

Affirmed.

5.  See Hort v. Commissioner, 313 U.S. 28, 30, 31, 61 S.Ct. 757, 85 L.Ed. 1168.