212 F.2d 52
 54-1 USTC P 9342
 COMMISSIONER OF INTERNAL REVENUE,
v.
GREGORY RUN COAL CO.
COMMISSIONER OF INTERNAL REVENUE,
v.
VINCENT.
COMMISSIONER OF INTERNAL REVENUE,
v.
J. E. VINCENT CO., Inc. (two cases).
B. H. SWANEY & SONS, Inc. et al.
v.
COMMISSIONER OF INTERNAL REVENUE.
 Nos. 6727-6730, 6767.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 16, 1954.
Decided April 9, 1954.
 
 Sidney B. Gambill, Washington, D.C. (James H. Beal, Robert F. Banks and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on brief), for Gregory Run Coal Co., J. E. Vincent and J. E. Vincent Co., Inc.
 Robert B. Ross, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., on brief), for Commissioner of Internal Revenue.
 Arch M. Cantrall, Clarksburg, W. Va. (W. G. Stathers and Stathers & Cantrall, Clarksburg, W. Va., on brief), for B. H. Swaney & Sons, Inc., and Swaney Contracting Company.
 Richard L. Levy, William T. Coleman, Jr., Philadelphia, Pa., Edgar J. Goodrich, Lipman Redman, Washington, D.C., Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., and Guggenheimer, Untermyer, Goodrich & Amram, Washington, D.C., on brief for J. Robert Bazley, Inc. and John Schumacher amici curiae.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 These appeals and cross appeals relate to the income taxes for 1947 of J. E. Vincent; the income taxes of J. E. Vincent Co., Inc. for the fiscal year ending April 30, 1948 and the fiscal year May 1, 1948 to January 3, 1949; the income, declared value excess profits, and excess profits taxes for the period June 11, 1945 to December 31, 1945 and income taxes for 1946 of Gregory Run Coal Company and the income taxes of B. H. Swaney & Sons, Inc. for the fiscal year ending September 30, 1947, and of Swaney Contracting Company for the fiscal year ended July 31, 1947. J. E. Vincent and the named corporations were engaged in the business of strip mining of coal in Harrison County, West Virginia.
 
 
 2
 The most important question for determination is the disposition of the allowance for depletion, which in the case of coal mines is 5 per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect to the property. See Internal Revenue Code, § 23(m), § 114(b) (4), 26 U.S.C.A. §§ 23(m), 114(b), § 29.23(m)-1 of Treasury Regulation 111.[1]
 
 
 3
 Other questions relate to (1) the right of the Gregory Run Coal Company, one of the Vincent corporations, to deduct the amount of reserves set up by it in 1945 and 1946 to cover the cost of restoration work to be done thereafter; (2) the inclusion in the taxable income of Vincent for the year 1947 of the sum of $808,064.46 turned over by him to J. E. Vincent, Inc. in that year; and (3) the inclusion in the taxable income of J. E. Vincent, Inc. for the year 1947 of the sum of $53,795.64 paid by J. E. Vincent, Inc. to Gregory for coal purchased from Gregory and sold by J. E. Vincent, Inc.
 
 
 4
 In the spring of 1945 Vincent acquired four leases of coal lands which entitled him to strip mine coal on Gregory Run in Harrison County, West Virginia, at a specified royalty ranging from 10 to 12cents per ton, payable in each case to the lessor. All of the leases obligated the lessee to comply with the laws of West Virginia which impose a duty on coal strippers to backfill and regrade the land stripped of coal and to plant trees and vegetation on it. W. Va. Code of 1949, Ch. 22, § 2461(5).
 
 
 5
 On June 12, 1945 Vincent assigned these leases to the Gregory Run Coal Company, a West Virginia corporation, the stock of which was issued to him and J. B. Williamson in equal shares in consideration of the payment of $500 by each of them. Under the terms of the assignment Gregory was to pay Vincent the sum of $10,000 and a royalty of 40cents per ton of the coal mined and sold. Under an arrangement between Vincent and Williamson one-half of this royalty was to go to Vincent as part consideration for the assignment of the leases, and one-half to Williamson for the use by Gregory Run of a tipple owned by Williamson. These sums were held to be reasonable by the Tax Court. In order to carry on the operation Gregory Run purchases from Williamson strip mining equipment for the sum of $73,142.50 to be paid at the rate of 23.8cents per ton of coal mined. Gregory also purchased additional equipment from Mrs. J. B. Williamson for $13,100 to be paid for at the rate of 6cents per ton of coal mined.
 
 
 6
 At or about the same time Vincent entered into an agreement to sell to J. H. Weaver Company, a corporation, all of the strip coal that would be produced by Vincent from the leased premises and the Weaver Company agreed to pay the prevailing maximum sale price whether fixed by the Office of Price Administration or established by market conditions, less 24cents a net ton, the price to be adjusted in case of a decrease in the market. Vincent was to pay all the rents and royalties due the lessors for the coal produced and sold. This agreement was assigned by Vincent to Gregory Run.
 
 
 7
 Also about the same time Vincent incorporated the Summit Fuel Company under the laws of West Virginia; and he and Williamson each acquired one-half of this stock. Gregory Run and Summit Fuel entered into a joint agreement for the mining of the leased property and the transportation and loading of the coal. Under the agreement this was to be accomplished by the use of the tipple and strip-mining equipment belonging to Gregory Run, the use of motor vehicles belonging to Summit Fuel, and labor furnished by Summit Fuel. Summit Fuel was to mine and haul the coal to the tipple and process it and load it on the railroad cars and Gregory Run was to sell it. Summit Fuel also agreed to refill and recondition the surface of the mined area, in accordance with the laws of West Virginia; but Gregory Run was to obtain the permit required by the state law and bear the expense of the bond, and pay the cost of the refill.
 
 
 8
 Gregory Run filed its income tax returns on the accrual basis for the period from June 11, 1945, when it was incorporated, to the end of the year, and also for the year 1946. In claimed deductions in these years for reserves for backfilling in the respective amounts of $14,352.15 and $22,354.30, computed at the rate of 10cents per ton mined. No backfilling has actually been done by or on behalf of Gregory Run.
 
 
 9
 On February 24, 1947 Gregory Run assigned the coal leases to Coal Service Corporation which agreed to substitute its bonds for those of Gregory Run so as to exonerate Gregory Run from liability thereunder and Gregory Run agreed to indemnify Coal Service against loss arising out of Gregory Run's operations on the leases premises, except with respect to claims of lessors based on the failure of Gregory Run to backfill and restore the property.
 
 
 10
 The Commissioner disallowed the deductions claimed by Gregory Run for the estimated cost of backfilling. The Tax Court found for the Commissioner on this issue and Gregory Run has appealed.
 
 Depletion Issue
 
 11
 The depletion issue is brought to this court by the appeal of the Commissioner in the cases of Gregory Run, No. 6727, Vincent, No. 6728, and Vincent, Inc. Nos. 6729 and 6730; and also by B. H. Swaney & Sons, Inc. and Swaney Contracting Company in case No. 6767. The question involved is whether the taxpayer, who mined the coal under the contracts herein described, as distinguished from the taxpayer, who held the leases on the coal land, had such an economic interest in the operation as to entitle it to take the deduction for depletion allowed by the federal statutes.
 
 Gregory Run Depletion
 
 12
 Specifically the question in this regard is whether Gregory Run, in computing its depletion deduction for its tax years 1945 and 1946, was required to deduct from the gross income of its mining property the amounts it accrued and paid during these years to Summit Fuel, with the result that Summit Fuel could take a depletion deduction on its gross income. Summit Fuel, being controlled by Vincent, did not claim the deduction. This fact, however, did not affect the computation of the gross income of Gregory Run subject to the depletion deduction.
 
 
 13
 The contractual relationship between Gregory Run and Summit Fuel has already been described. In accordance with the agreement between them, Summit Fuel from June 11, 1945 to December 31, 1945 stripped and hauled coal from the leased properties and was paid by Gregory Run the sum of $222,617.43 therefor. In 1946 Summit stripped the land and hauled the coal until July 1, and thereafter Gregory Run did the stripping and Summit Fuel the hauling. During 1946 Gregory Run paid Summit Fuel $189,005.63 for stripping and $86,367.19 for hauling; and these amounts were reported as income by Summit Fuel in 1945 and 1946. The Commissioner held that Gregory Run should exclude these amounts from its gross income in computing its depletion allowance. The Tax Court decided in favor of Gregory Run on this point and thereby denied Summit Fuel the right to share the deduction for depletion; and the Commissioner has appealed.[2]
 
 Swaney's Depletion
 
 14
 A similar question arises with respect to the denial of a depletion deduction to B. H. Swaney & Sons, Inc. and Swaney Contracting Company in Case No. 6767. On December 24, 1945 Vincent entered into a contract with Swaney Contracting Company, a West Virginia corporation, wherein he employed the corporation to strip mine coal covered by the Dawson and other leases to Vincent on Lambert's Run. Under the contract Vincent provided the sidetrack and the tipple and the men to operate them, paid their wages, and had complete charge of the coal after it was loaded or dumped at the tipple. Swaney Contracting furnished the equipment and employees to mine and haul 24,000 tons of coal a month and bound itself to backfill and restore the land in accordance with the terms of the lease. Swaney Contracting agreed to secure the necessary bonds and mining permits required by the state, and to maintain adequate public liability and property damage insurance as to its operations. Vincent was to carry insurance as to the tipple and sidetrack. It was expressly provided that in all respects Swaney was to operate as an independent contractor in its field. Swaney Contracting was to be paid for its services on the basis of the coal accepted and paid for by the Weaver Company, the sales agent of Vincent, at the rate of $2 per net ton; but Vincent remained liable for the payment; and there were provisions for the adjustment of the basic payment in the event of a change in the sales price of the coal. The contract was not cancellable except on specified defaults by the parties or in the event that the sales price of the coal fell below $2.76 per ton. Vincent remained liable to pay the royalties due to the lessor under the leases.
 
 
 15
 Another stripping agreement was made on April 26, 1947 between Vincent and B. H. Swaney & Sons, Inc., another West Virginia corporation, with respect to property on Lambert's Run. Swaney, Inc. was to strip, load and haul to a tipple operated by Vincent all the coal under the lease that was not being operated by another contractor. The provisions of the agreement were similar to those in the contract between Vincent and Swaney Contracting, except that the compensation to Swaney, Inc. was to be at the rate of $2.18 per ton. Provision was made for adjustment on this compensation in the event of changes in the sales price of the coal. Vincent had the option to cancel the contract if the price of the coal fell to a point where the operations were unprofitable to him.
 
 
 16
 Both of the Swaney Companies carried out their agreements. The price of coal increased during the period of their operations. Each of them received compensation in excess of the base amount per ton specified in the contracts.
 
 
 17
 Vincent and J. E. Vincent Co., Inc., hereinafter referred to, both contended that there was no transfer of a depletable interest to either of the Swaney Companies under the contracts described above and hence Vincent or Vincent Company, Inc. was entitled to the statutory depletion deduction. The Tax Court sustained this contention in cases Nos. 6727 to 6730. Subsequently the Swaney cases were tried and the taxpayers contended that they were entitled to a depletion deduction but the Tax Court maintained the same position as it had in the Vincent cases, and the Swaney companies have appealed in case No. 6767.
 
 
 18
 Organization of J. E. Vincent Co., Inc.
 
 
 19
 On April 30, 1947 Vincent organized the J. E. Vincent Co., Inc. and there were issued to him 60 shares of stock, and to his wife and son 10 shares of stock each which were paid for at the rate of $100 per share. There is evidence that Vincent was in bad health and desired that his son, who had returned from military service, should have an interest in the business represented by the Lambert's Run property, and the corporation was formed for the purpose of taking over this business. The lessor, however, refused to permit Vincent to assign the lease to the new corporation. Thereupon on May 15, 1947 the directors of the corporation adopted a resolution that the corporation would operate the coal without a formal assignment of the leases just as if said assignment had been made; and on the same day the corporation entered into a contract with Vincent whereby Vincent leased to it the tipple, sidetrack and appurtenances, and gave it the right to load over the tipple the coal mined on the leased premises, in consideration of which the corporation agreed to pay Vincent 5cents per ton of the coal loaded over the tipple. The corporation obligated itself to operate the tipple and to keep it and the sidetrack in good working condition.
 
 
 20
 The agreement, however, provided that Vincent was to continue to operate in his own name the Lambert Run strip mines and was to be regarded as the operator of the coal, subject only to the contract of April 26, 1947 between him and Swaney, Inc. for the stripping of the coal. The contract between Vincent and the Weaver Company for the sale of the coal was not assigned to Vincent, Inc.; and Vincent was to continue to receive payment from his sales agent for all the coal loaded over his tipple and sidetrack and was to pay out of the proceeds of the sales brokerage, royalties for the coal, surface rights, rights of way, rental on the sidetrack and buildings and other similar royalties. After deducting all these payments Vincent was to pay the net proceeds of the sales to the corporation. Out of such net proceeds the corporation was to pay Swaney, Inc. the amounts payable for stripping the coal. The contract between Vincent and the corporation was cancellable by either party on 30 days notice.
 
 
 21
 Between June 30 and December 31, 1947, Vincent turned over to Vincent, Inc. $808,064.46 as the net proceeds from the sale of the coal under the contract and the corporation paid Swaney Contracting Company and Swaney & Sons, Inc. $448,379.25 and also paid other expenses in the aggregate sum of $117,364.42. The result was that the corporation, without having any responsibility for the mining or the sale of the coal made a handsome profit, merely for the operation of the tipple and subsidiary services.
 
 
 22
 The Commissioner held that the $808,064.46 which Vincent turned over to the corporation during 1947 was his income and as such was taxable to him and allowed him an additional deduction in the expenses by Vincent, Inc. during the year 1947. The Tax Court sustained this holding and Vincent has appealed.
 
 
 23
 In order to complete the recital of the relationship between Vincent and the corporation it should be added that on December 1, 1947, Vincent notified the corporation of his election to terminate the agreement as of January 1, 1948. At or about the same time, however, Vincent was given to understand that the lessor would offer no objection to the assignment of the lease by Vincent to the corporation. Thereupon by agreement of January 2, 1948 Vincent assigned to the corporation his leases on the Lambert Run properties, subject to the strip mining contract between Vincent and Swaney & Sons, Inc. of April 26, 1947. After the assignment the proceeds from the sale of the coal were paid directly to Vincent, Inc. and for the subsequent period during the year 1948 the Commissioner held that the corporation was taxable with the net income derived from the sale of the coal, and this determination is not challenged on this appeal.
 
 
 24
 Vincent, Inc. was liquidated on January 3, 1949 and Vincent reported a capital gain of $82,644.02 as realized on the liquidation of his stock in the corporation.
 
 
 25
 We are in accord with the conclusion of the Tax Court that Gregory Run was not justified in deducting the reserves which it set up on its books on the accrual basis for the estimated cost of backfilling the land in 1945 and 1946 at the cost of 10cents per ton of coal mined. The situation now before us is distinguishable from that which existed in Harrold v. Com'r, 4 Cir., 192 F.2d 1002, where we held that the estimated cost of refilling a strip coal mine was properly accrued and deducted in the tax year, because the obligation to refill had become fixed in that year and the amount was susceptible of a reasonably accurate estimate in that year based on the actual experience of the taxpayer over a long period. In that case we held, 192 F.2d at page 1006, 'We conclude that when all the facts have occurred which determine that the taxpayer has incurred a liability in the tax year, and neither the fact nor the amount of the liability is contested, and the amount, although not definitely ascertained, is susceptible of estimate with reasonable accuracy in the tax year, deduction thereof from income may be taken by a taxpayer on an accrual basis.' See also Central Cuba Sugar Co. v. Com'r, 2 Cir., 198 F.2d 214, 217, 218; Patsch v. Com'r 3 Cir., 208 F.2d 532.
 
 
 26
 We reaffirm that decision, but it does not support the taxpayer's contention in the instant case because the evidence does not indicate that the amounts accrued were arrived at by a reasonably accurate estimate based upon experience. The only testimony on the point was the bare statement of J. E. Vincent that in his opinion a reasonable estimate of the cost of backfilling was 10cents a ton. The opinion was not supported by evidence as to the condition of the land to be refilled or as to the relation, if any, between the amount of coal taken out to the amount of the backfill, or as to the probable cost indicated by the past experience of the witness. The case therefore more closely resembles Patsch v. Com'r, supra, in which the rule of the Harrold case was approved but the accrual was not allowed because it was not calculated in the light of the actual facts and conditions of the particular area but was based on an arbitrary rule of thumb.
 
 
 27
 In view of the inadequacy of the estimate of the cost of the backfilling it is unnecessary to consider the further contention of the Commissioner that Gregory's obligation in this connection was merely to reimburse Summit Fuel, if and when Summit Fuel complied with its agreement to make the backfill; and that in fact Gregory was never required to reimburse Summit Fuel because in 1947 Coal Service relieved Gregory of the obligation and there is no evidence that the backfilling has actually been done; and no evidence that Gregory Run reported the accrued amounts as taxable income when Coal Service assumed the responsibility for backfilling in 1947.
 
 
 28
 We also affirm as correct the holding of the Tax Court that the sum of $808,064.46 turned over by Vincent to J. E. Vincent, In. between May 1 and December 1, 1947 must be considered income earned by Vincent as the coal operator and therefore taxable to him. We do not base this conclusion on the view that the corporation and Vincent were actually one and the same entity for purposes of taxation but on the evidence which indicates that the sum involved was the product of Vincent's operations and therefore may not be attributed to the corporation. It is clearly established that throughout the period Vincent continued to be the operator of the enterprise. Indeed it was expressly agreed between him and the corporation that he should continue to fill this role. As such he controlled the production of the coal through his stripping contracts with the Swaney corporations, and also the sale of the coal through his contract with the Weaver Company, his sales agent. These were the productive and essential factors of the business; and there remained only the operation of the tipple, a necessary but nevertheless routine processing step in the production of the coal, involving a relatively stable expenditure and having little influence on the success or failure of the business. There was no dealing at arms' length between Vincent and the corporation as to the compensation to be paid to it for assuming this function; and the turning over of all the profits of the enterprise, reserving to Vincent only 5cents per ton for the use of his tipple property, had no genuine relation to the actual value of the tipple services. This is clearly seen in the income tax return of the corporation for the fiscal year ended April 30, 1948 in which the corporation reported a net income of $322,853.70 and a total income tax liability of $122,684.41.
 
 
 29
 It is also of importance to note that Vincent had the right to cancel the contract on thirty days notice-- and thereby retained such control of the situation as is deemed highly significant in determining the ownership of income. The Tax Court was well justified in concluding that the net result of the arrangement between Vincent and the corporation was that Vincent paid over to it income earned by him as an operator of coal properties and an owner of coal leases and other properties in connection therewith. Under these facts the income must be regarded as Vincent's income and he was not relieved of tax liability thereon. See Lucas v. Ear, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055. Cf. Blair v. Cmmissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465. See also 2 Mertens, Law of Federal Income Taxation (1942) § 18.13, n. 46a, 1953 Cumulative Pocket Supplement. It is an elementary principle of federal income tax law that an assignment of income, whatever its guise, will not absolve the assignor from income tax liability. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 605, 68 S.Ct. 715, 92 L.Ed. 898; Home Furniture Co. v. Com'r, 4 Cir., 168 F.2d 312.
 
 
 30
 Vincent also contends that even if it was incorrect for Vincent, Inc. to report the sum of $808,064.46 as income during the year 1947, nevertheless a portion of this sum, to wit, the sum of $53,795.64 was in truth and in fact income earned by the corporation. The details underlying this contention are not clearly set forth in the record or in the briefs of the parties and the point is raised for the first time on this appeal. Ordinarily an appellate court does not give consideration to issues not raised below. Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037. We see no reason to depart from this rule under the circumstances in this case, but since our decision will require further proceedings, the Tax Court would consider this contention on remand.
 
 
 31
 We come then to the question whether the operators who produced the coal under the contracts and assignments hereinbefore described, that is to say, Summit Fuel and the Swaney companies, were entitled to share in the statutory depletion allowance. As to Summit Fuel, it will be recalled that on June 12, 1945 Vincent assigned certain mining leases and also his agreement with the Weaver Company for the sale of the coal to Gregory Run, in consideration of the sum of $10,000 and the payment by Gregory Run of 40cents per ton of the coal mined and marketed; and that contemporaneously Gregory Run entered into an agreement with Summit Fuel, another Vincent Company, in which it was agreed that Gregory and Summit should jointly mine the leased premises and transport and load the coal, and that Gregory should market the coal and should pay to Summit $1.55 per ton for all the coal mined and transported by it; and that in accordance with this agreement Summit Fuel stripped and hauled the coal and was paid the compensation hereinbefore described.
 
 
 32
 Quite similar were the arrangements between Vincent and the two Swaney companies with respect to the strip minin of coal covered by other leases on land in West Virginia held by Vincent. The Swaney companies were to strip mine the coal, haul it to the siding and dump it in the cars or the tipple, after which Vincent was to have charge of the tipple and the coal and make sale through his agent. The Swaney companies were to furnish the machinery and equipment and sufficient labor to mine and haul a large tonnage per month, and the production was to be continuous and as uniform as possible. All the restoration and backfilling was to be done at the expense of the Swaney companies. For all these services the produces of the coal was to be paid $2.00 per ton in one instance and $2.18 per ton in the other, but provision was made for adjustment of the compensation in the event of changes in the sales price.
 
 
 33
 We think that the right of the strippers of the coal in these instances to share in the statutory depletion allowance is established by the decision of the Supreme Court in Burton-Sutton Oil Co. v. Com'r, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062. In that case the Cameron Parish School Board, the owner of oil lands, leased the same to one Sweeny who in turn assigned his rights to the Gulf Refining Company. The School Board and Sweeny each reserved to itself a royalty measured by the oil produced. The Gulf Refining Company in turn entered into a contract with one Sutton who, without reservation of royalty or interest, transferred the contract to the Burton-Sutton Oil Company, the taxpayer. The result was that the taxpayer was under an obligation to develop the oil land and sell the oil and to pay 50 per centum of the proceeds to the Gulf Refining Company. The court held that the 50% payments made by the taxpayer to Gulf were deductible from the taxpayer's gross income and that the contract could not be construed as a sale but rather an assignment of the right to exploit the property with a reservation in the assignor of an economic interest in the oil. In discussing the question as to what constitutes an economic interest entitling the holder thereof to a depletion allowance the court said, 328 U.S. at pages 32, 33, 34, 35, 66 S. Ct. at page 866:
 
 
 34
 'It seems generally accepted that it is the owner of a capital investment or economic interest in the oil in place who is entitled to the depletion. Anderson v. Helvering, 310 U.S. 404, 407, 60 S.Ct. 952, 953, 84 L.Ed. 1277; Euleon Jock Gracey, 5 T.C. 296, 302; Kirby Petroleum Co. v. Commissioner, supra (326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343). Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place. Palmer v. Bender, 287 U.S. 551, 557, 558, 53 S.Ct. 225, 227, 77 L.Ed. 489. Nor has the title to the oil in place been considered by this Court as decisive of the capital investment of the taxpayer in the oil. Technical title to the property depleted would ordinarily be required for the application of depletion or depreciation. It is not material whether the payment to the assignor is in oil or in cash which is the proceeds of the oil, Helvering v. Twin Bell (Oil) Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383, nor that some of the payments were in the form of a bonus for the contract, Burnet v. Harmel, 287 U.S. 103, 111, 53 S.Ct. 74, 77, 77 L.Ed. 199; Murphy Oil Co. v. Burnet, 287 U.S. 199, 302, 53 S.Ct. 161, 162, 77 L.Ed. 318. Congress, however, has recognized the peculiar character of the business of extracting natural resources. Leases are a method of exploitation of the land for oil and payments under leases are 'income to the lessor, like payments of rent.' Receipts from oil sales are gross income to the operator and subject to statutory deductions. Since lessors as well as lessees and other transferees of the right to exploit the land for oil may retain for themselves through their control over the exploitation of the land valuable benefits arising from and dependent upon the extraction of the oil, Congress provided as early as the Revenue Act of 1918 for equitable apportionment of the depletion allowance between them to correct what was said to be an existing inequality in the law or its administration.
 
 
 35
 'In the present case, the assignor of the petitioner before assignment had an economic interest in the oil in place through its control over extraction. Under the contract with petitioner, its assignor retained a part of this interest-- fifty per cent of net. Like the other holders of such economic interest through royalties, the petitioner looked to the special depletion allowances of Sec. 114(b)(3) to return whatever capital investment it had. The cost of that investment to the beneficiary of the depletion under Section 114(b)(3) is unimportant. Depletion depends only upon production. It is the lessor's lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest in the oil. See Kirby Petroleum Co. v. Commissioner, supra (326 U.S. at page 604) 66 S. Ct. (at page) 411. Through retention of certain rights to payments from oil or its proceeds in himself, each of these assignors of partial exploitation rights in oil lands has maintained a capital investment or economic interest in the oil or its proceeds. As the oil is extracted and sold that economic interest in the oil in place is reduced and the holder or owner of the interest is entitled to his equitable proportion of the depletion as rent or royalty. The operator, of course, may deduct such payments from the gross receipts.'
 
 
 36
 We see no material difference between the right of the producer of the oil in the cited case to a depletion allowance and the right of the miners of the coal in the instant case to such an allowance. The fact that in the cited case the amount of the compensation of the producer was a specified percentage of the proceeds of the product, whereas in the pending case the compensation of the producer was fixed by the selling price of the coal, adjustable to changes in the market, is not significant; nor is it of importance that in the one case the producer also sold the product whereas in the other the sale of the coal was in the hands of the assignor of the contract. In both cases the depletion was dependent upon production and in both the possibility of profit from the use by the operator of his rights over production was dependent solely upon the extraction and sale of the product and gave him an economic interest therein. As was well said by Judge Watkins in Eastern Coal Corp. v. Yoke, D.C.N.D.W. Va., 67 F.Supp. 166, 175, 'Irrespective of conveyancing formalties, one who has a right to share in coal produced also has a corresponding interest in the coal in place.' See also Spalding v. United States, D.C.S.C. Cal. 17 F.Supp. 957.
 
 
 37
 As will appear from the cases cited in the Burton-Sutton Oil Co. v. Com'r case, it is not always easy to draw the line between a transaction which amounts to a complete sale of the interest of an owner in oil or coal lands and a retention of an economic interest which entitles the owner to an equitable share of the deduction for depletion. Nor is it always easy to draw the line between transactions which constitute one a purchaser of an economic interest, as distinguished from one who merely performs the labor of production for a fixed sum and thereby becomes merely the hireling of the producer for a specific purpose. We think, however, that in the pending case the rights of the producers were completely dependent upon the extraction of the salable product and that consequently they were entitled to share in the benefits of the statute which were designed to give compensation to persons interested in the production of a wasting asset.
 
 
 38
 The orders of the Tax Court in these cases are vacated, and the cases are remanded for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Section 23(m) of the Internal Revenue Code provides that there shall be allowed as a deduction in computing net income in the case of mines, a reasonable allowance for depletion. Section 144(b)(4) of the Code enlarges on this by providing specifically that percentage depletion for coal mines shall be 5 per centum of the gross income from the property, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer
 Section 29.23 (m)-1 of Treasury Regulations 111, promulgated under the Internal Revenue Code provides that the owner of an economic interest in mineral deposits is allowed actual depletion deductions, and defines 'economic interest' by stating that such an interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place and secures, by any form of legal relationship, income derived from the severance and sale of the mineral, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest.
 
 
 [2]
 The amounts paid by Gregory Run to Summit Fuel arose from the sale of the coal by Gregory and were paid in accordance with the contract between Gregory Run and Summit Fuel which provides that the latter 'for its participation in this joint adventure' should receive $1.55 per ton for all the coal mined, transported and loaded by it. Either party had the right to cancel the agreement except that in case Gregory served notice of cancellation, then Summit should have the right to mine and remove all the coal which had been uncovered at that time