**James C. and Helen M. STALLARD**

v.

**UNITED STATES of America.**

**Dewey H. and Geneva STALLARD**

v.

**UNITED STATES of America.**

**Civ. A. Nos. 620, 621.**

United States District Court
W. D. Virginia,
Abingdon Division.

Dec. 30, 1958.

John Y. Merrell, Washington, D. C., Waldo G. Miles, Bristol, Va., for plaintiffs.

John Strickler, U. S. Atty., H. Clyde Pearson, Asst. U. S. Atty., Roanoke, Va., Lyle M. Turner and Peter J. Donahue, Attys., Dept. of Justice, Washington, D. C., for defendant.

ROBY C. THOMPSON, Chief Judge.

■ These actions having been tried upon the facts to the Court without a jury, the Court will hereafter find the facts as specifically set forth and will state separately its conclusions of law thereon.

These are two actions consolidated for trial, the issues being identical. In Case No. 620, plaintiffs are James C. Stallard and his wife, Helen M. Stallard; in Case No. 621, plaintiffs are Dewey H. Stallard and his wife, Geneva Stallard. Dewey H. Stallard and James C. Stallard, father and son, are equal partners in the Stallard Bros. Co., a partnership hereafter referred to as the "Partnership", which has engaged in strip mining in Virginia and Kentucky since 1947. The joint plaintiffs seek to recover taxes allegedly illegally collected from them for the year 1953.

On or before March 15, 1954, the plaintiffs in each of these cases filed joint Federal tax returns for the year 1953 and paid the amounts shown thereon. Each partner showed on his return his share of partnership income. These actions are founded on the plaintiffs' claim that the Partnership had an economic interest in the coal it mined under certain contracts with the Clinchfield Coal Corporation of Dante, Virginia, hereafter referred to as "Clinchfield", and was therefore entitled to a depletion deduction under Sec. 23(m) and Sec. 114(b) (4) (A) (ii) of the 1939 I.R.C., 26 U.S. C.A. §§ 23(m), 114 (b) (4) (A) (ii), and appropriate regulations thereunder. The Partnership did not claim the depletion deduction in its return for 1955, but each partner filed a claim for refund prior to March, 1957, in the following amounts: James C. and Helen M. Stallard, $15,931.42; Dewey H. and Geneva Stallard, $15,847.28. The spouses of the partners are the parties to this action only because they filed joint income tax returns with their husbands.

The strip mining done by the Partnership was performed under two contracts which are so substantially similar in terms that for the purposes of this case, they may be considered as identical. The earlier one, the Justice Fork contract, is here set forth in its entirety.

"December 4, 1952
"Stallard Brothers Company
"Box 82
"Pennington Gap, Virginia
"Gentlemen:

"This letter will confirm the mutual understandings and agreements reached by you and Clinchfield at a conference in Dante, Virginia, on this date with our Messrs. C. K. Tieche and H. W. Livingston, with reference to your mining by the strip mining method on a certain tract of coal owned by Clinchfield. This letter will further serve as the Mining Contract by the parties.

"*One*: Said contract strip mining will be referred to as the Justice Fork Strip Job. Such tract of coal lies on Justice Fork near our Meade Mine operation and you will mine by stripping that certain tract or tracts of coal in this vicinity as has and will be from time to time laid out to you by authorized representatives of Clinchfield.

"*Two*: You will mine this coal and truck it to a point that has been agreed upon where you will load the same into mine cars that have been provided by Clinchfield. Representatives of Clinchfield will be permitted, at all reasonable times, to survey, measure, inspect, and examine the mine workings. You are to conduct all mining operations upon these premises in accordance with

all existing laws of this State and of the United States, and in accordance with the rules and regulations of the Mining Departments of the state and federal governments, now or hereafter in effect, and in a workmanlike manner and in accordance with the rules of good and customary mining. You are to furnish your own explosives, tools and other equipment; to employ, discharge, discipline and compensate the miners and other working forces doing the work and without reliance or call upon Clinchfield with respect to such miners; and to provide competent supervision, control and direction of such working forces. All coal mined on these tracts and under this mining contract is to be delivered to Clinchfield Coal Corporation and none of such coal shall be sold or delivered otherwise.

*"Three*: You will prosecute mining operations actively and continuously to the end that a daily production of approximately 400 tons of coal, that meets the quality standards of Clinchfield, is attained and maintained, except when prevented by market conditions or other circumstances beyond your control.

*"Four*: It has been mutually agreed that Clinchfield will pay to Stallard Brothers Three Dollars Twenty-two cents ($3.22) per net ton on a clean coal basis. It is further agreed that to arrive at a clean coal basis, the raw coal tonnage would be reduced by ten percent (10%). It is understood that this ten percent (10%) reduction in mine car weights is to cover the estimated tipple rejects. In effect, Clinchfield would thereby pay to Stallard Two Dollars Ninety cents ($2.90) per net ton of raw coal loaded into the mine car.

*"Five*: This Mining Contract is subject to cancellation by either of the parties hereto upon the giving of thirty (30) days written notice, by the one to the other, of the party's intention so to do.

*"Six*: Stallard shall carry and pay for and shall file with Clinchfield proper and acceptable evidence of the following described insurance:

"A. Workmen's Compensation and/or Employer's Liability Insurance which shall comply with the laws of the state in which the work is to be performed and shall cover all of it's employees engaged in the work to be performed under this contract.

"B. Comprehensive Public Liability and Property Damage Insurance covering work performed under this contract with bodily injury limits of $100,000 as to any one person and $200,000 as to any one accident, and with property damage limits of $5,000 as to any one accident, and $25,000 as to the aggregate.

"Stallard is, and shall be deemed to be, an independent operator and solely liable for damages on account of injuries to persons or property arising in performance of this contract and agrees that Stallard will indemnify and save Clinchfield harmless from and against liability, loss or damage to property, or injury to or death of any person or persons, arising from or growing out of the work or operation under this contract, except such as may arise out of the sole negligence of Clinchfield.

"Stallard agrees that it will carry out the work under this contract in a good and workmanlike fashion, diligently in good faith and without waste; that Stallard will comply with the provisions of the Federal Social Security Acts [42 U.S.C.A. § 301 et seq.], the National Labor Relations Act with subsequent amendments [29 U.S.C.A. § 151 et seq.], the Wage and Hour Act and amendments [29 U.S.C.A. § 201 et seq.], the Withholding provisions of the Internal Revenue Code and the Unemployment Compensation Laws of the state in which the work is to be performed; that similar requirements as to the above, as to the

insurance coverage and as to the hold harmless clause, will be made of any sub-contractor employed to perform under this contract; and that Stallard will indemnify and save Clinchfield harmless from and against all claims and liens for labor, materials, supplies, and equipment used in the performance of the work under this contract and will furnish evidence satisfactory to Clinchfield of payment of such claims.

"This letter and contract is being sent to you in duplicate. If the foreging correctly states our mutual understandings and agreements, will you kindly execute one copy in the space provided and return it for our file.

"Your very truly,
"/s/ R. H. Hughes
Vice President

"Accepted:
"Stallard Brothers Company
"/s/ James C. Stallard
"/s/ Partner & General Manager"

### Issue to Be Decided.

*Are the plaintiffs entitled to a percentage depletion deduction on coal which they mined under contracts with Clinchfield Coal Corporation?*

Statutes applicable are here set forth:

Internal Revenue Code of 1939:

Section 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*"

Section 114. Basis for Depreciation and Depletion.

"(b) Basis for depletion

\* \* \* \* \* \*

"(4) Percentage depletion for coal \* \* \*.

"(A) In general. The allowance for depletion under section 23(m) \* \* \* shall be, \* \* \* in the case of coal \* \* \* 10 per centum \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect to the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property \* \* \*."

(26 U.S.C. 1952 ed. Sec. 114)

Treasury Department Regulation 111, promulgated under the Internal Revenue Code of 1939:

"Sec. 29.23(m)–I. Depletion of Mines, Oil and Gas Wells, Other Natural Deposits, and Timber; Depreciation of Improvements.—Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

"Under such provisions, the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But

a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest."

The Court makes the following findings of fact:

## I.

The written contracts did not constitute a full embodiment of the true understanding and agreement between the parties; all the facts and the complete agreement must be considered in determining whether or not the Partnership is entitled to the depletion allowance claimed.

## II.

The Partnership was to remove the overburden, grade the area for the laying of track for coal cars, mine the coal, truck it from the mine, and load it into mining cars at Clinchfield's tipple; the mining was to be done in accordance with federal and state mining laws; it was an independent contractor, and as such was required to carry Workmen's Compensation and public liability insurance; it was to furnish all men, tools, and equipment necessary for workmanlike performance of the job; it was required to negotiate a contract with the United Mine Workers of America and to pay 40¢ on each ton of coal mined into that Union's Welfare Fund; it agreed to enter into negotiations for the use of the surface of certain land to which Clinchfield held the mineral rights with certain adverse surface owners named McFall, to build access roads and ramps, albeit of relatively crude construction, and to put up some buildings and a powderhouse, at a total cost of between twenty and twenty-five thousand dollars.

## III.

All the coal mined by the Partnership was to be delivered to Clinchfield exclusively. The Partnership was required to mine four to five hundred tons daily, and the tonnage clause of the contracts also contained the qualification that the production was to be maintained at a certain rate "except when prevented by market conditions or other conditions beyond your control". The price per ton paid to the Partnership, although apparently fixed in the contract, actually varied over the three years in which the contracts were in effect, depending on supply and demand and the price available to Clinchfield in the market.

An example of such a fluctuation appears in a letter dated January 26, 1954, wherein Clinchfield notified the Partnership as follows:

"You are familiar, of course, with the condition of the coal business at this time; also, with the fact that we have found it necessary to make sizeable reductions here and there in an attempt to stay competitive.

\* \* \* \* \* \*

"Accordingly, on and after Monday, February 1, 1954, the price that we will pay for coal delivered to our Moss Mine Tipple, Moss, Virginia, will be reduced by ten cents (10¢) per net ton.

"We have hesitated to take this action, but now we see no alternative and we trust that you can bear with this situation, as we are, until business conditions are more favorable."

Over the period of these operations there were at least four changes from the original price per ton set in the contracts, and these changes paralleled the national trend in the market price of coal. Pl.Ex. 12 and 13, and Gov.Ex. 2. The price per ton paid by Clinchfield to the Partnership for mining the coal was geared to the general market price.

## IV.

Prior to undertaking these jobs, the Partnership owned approximately $70,-

000 worth of heavy equipment suitable for engaging in stripping operations. In order for the Partnership to perform the jobs in a workmanlike manner, it was necessary for it to acquire additional heavy equipment, which it did, increasing its investment in equipment from approximately $70,000 to approximately $400,000 by the completion of the job. Clinchfield loaned the Partnership $15,000 to allow it to purchase more heavy equipment, after it had exhausted its money and its credit elsewhere.

## V.

Before entering into these mining contracts, Clinchfield had estimates prepared of the tonnages of coal located within these tracts and of the time which would be required to mine the tracts to exhaustion at the rate per day set in the contracts; the total tonnage estimated was approximately one quarter of a million tons of coal and the total time estimated to be required was two or three years. Clinchfield designated the location of the job and specified that "you will mine by stripping that certain tract or tracts of coal in this vicinity. * * * "

The number of tons to be mined and the time required to mine the same were determinative factors considered by the Partnership in deciding whether to incur the heavy expenditures required to do the jobs.

## VI.

Clinchfield elected not to mine this coal itself, but entered into these contracts under which the Partnership was obliged to make the substantial investment necessary for the extraction of the coal and was also required to assume the full responsibility for the production of the coal at its own risk and expense. Whatever investment, whether in equipment, time, effort, or wealth, necessary for the extraction of coal was made by the Partnership, and Clinchfield was relieved of all these burdens. Clinchfield had no part in the production of the coal, but merely received the coal at its tipples, processed, and marketed the same.

Clinchfield knew of the large capital expenditure being made by the Partnership for the performance of these contracts, and, although there was a thirty day cancellation clause included in each of the contracts, this feature of the contracts was not discussed nor was it the subject of any negotiation. The Partnership understood that the thirty day clause was included for the protection of Clinchfield in case it did a wasteful or unworkmanlike job. Clinchfield inserts this termination provision in all its strip mining contracts as a matter of form. Clinchfield understood that the clause would protect it if there was no market for the coal mined by the partnership. It contended that the termination clause was also intended to assure it the full depletion allowance for tax purposes; if so, it did not deal fairly and above board with the Partnership. If it had intended to contract with respect to depletion allowances, it would have been a simple matter to have negotiated with the Partnership and to have inserted a clause in the contract to that effect.

The cancellation clauses of the contracts were never intended to be implemented simply at the will of either of the parties, but only as the result either of a fluctuation in market conditions making it unprofitable to continue the operation or of a failure on the part of the Partnership to mine the coal in accordance with the methods set forth in the contracts.

The parties never intended that the mining contract should be terminated at will upon thirty days notice by either party, but both parties to the contracts were thinking in terms of a long-term operation, and both contemplated that the two areas should be, as in fact they were, mined to exhaustion exclusively by the Partnership.

## VII.

In 1955, in order to continue its operations, the Partnership was required to negotiate for and to obtain the right to use the surface of certain land bordering on one of the jobs from the surface owners, W. T. and Geneva McFall. The

Partnership obtained this right for the consideration of a twenty cent (20¢) per ton royalty which was paid by the Partnership to the McFalls for coal extracted from beneath the McFall land. After the McFall tract had been mined, it became necessary for the Partnership to haul some of the coal it mined across the surface of the McFall property in order to reach the Meade Mine where Clinchfield desired the delivery to be made. The Partnership was compelled to pay the McFalls a ten cent (10¢) per ton royalty for the right to haul the coal across the McFall tract. Clinchfield paid the Partnership an increase of ten cents (10¢) per ton for the coal extracted from the McFall tract, and an increase of five cents (5¢) per ton for coal hauled through the McFall tract to partially compensate the Partnership for these additional expenditures.

## VIII.

Clinchfield was under no obligation to take any specific amount of the coal produced, but could vary the amount accepted according to market conditions, and had no duty to pay the Partnership anything unless it took the coal; further, the coal mined by the Partnership under these contracts could only be sold to Clinchfield.

After the jobs were completed, the Partnership might have been able to have disposed of some of its second hand machinery and thereby recovered some of its capital investment. However, the only source to which the Partnership could look for the return of most of its capital investments was the severance and sale of the coal.

To summarize:

(a) The large investment made by the Partnership was made primarily for the performance of these two jobs;

(b) The Partnership was compelled to rely solely upon the severance and production of the coal on these two tracts for the return of most of its investment; *

(c) Clinchfield, while a lessor of the coal in place, was more nearly a processor and sales agent for the coal on these tracts;

(d) The price paid per ton for mining was geared to and dependent upon the general market price of the coal when processed;

(e) The contract was never intended to be terminable at the will of either party upon thirty days notice; and

(f) It was contemplated by the parties that the Partnership, exclusively, would mine to exhaustion the coal on these two tracts of land, as was done.

### Conclusions of Law

■ The depletion allowance is provided in Section 23(m) and 114(b) of the Internal Revenue Code of 1939. It is well settled that the right to a depletion allowance is dependent upon the ownership of an economic interest in the mineral deposit and that, where more than one taxpayer has such an economic interest, the allowance must be equitably apportioned between them.

The Partnership agrees that Clinchfield had an economic interest in the coal in place, but also claims it had such an interest. The Partnership contends it is entitled to a depletion allowance based on its gross income from the property and that in calculating the amount of allowable depletion to Clinchfield, there must be deducted from Clinchfield gross sales the amounts paid to the Partnership which mined and produced the coal.

The law pertaining to depletion allowances in these strip mine cases developed from the gas and oil depletion cases. Without reciting all that body of case law, it suffices to say that it has been held that

"The language of the statute is broad enough to provide, at least,

---

* There was no covenant on the part of Clinchfield to pay the Partnership for anything except for each ton of coal mined and delivered to Clinchfield tipples.

for every case in which the taxpayer has acquired, by investment, any interest in the oil" (or other mineral, presumably) "in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." Palmer v. Bender, 1933, 287 U.S. 551, at page 557, 53 S.Ct. 225, at page 226, 77 L.Ed. 489.

and that a distinction has been drawn between economic "interest" and "advantage", Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, at page 367, 58 S. Ct. 616, 82 L.Ed. 897. See also Thomas v. Perkins, 1937, 301 U.S. 655, at page 661, 57 S.Ct. 911, 81 L.Ed. 1324, and Palmer v. Bender, supra. These decisions were interpreted to mean that the owner of a capital investment in oil in place was entitled to the depletion deduction. Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, at page 32, 66 S.Ct. 861, 90 L.Ed. 1062. This body of case law was reaffirmed in Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, at pages 313, 314, 76 S.Ct. 395, at page 398, 100 L.Ed. 347, where the Court said:

> "In upholding the taxpayer's right to depletion on all such income, the Court based its decision on the grounds that a taxpayer is entitled to depletion where he has: (1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of oil, to which he must look for a return of his capital.'" (Citing Palmer v. Bender).

> "These two factors, usually considered together, constitute the requirement of 'an economic interest.'"

The Courts have interpreted and expanded the law dealing with the allowance of the depletion deduction in cases such as that now before this Court, and in so doing have established certain criteria for determining when such an allowance may be had.

The Fourth Circuit dealt with this situation in Commissioner of Internal Revenue v. Gregory Run Coal Company, 1954, 212 F.2d 52. There, this issue was most closely discussed in the Swaney depletion section of the opinion. Swaney Contracting Company was a strip mining organization which contracted with one Vincent, a coal operator owning coal leases, to strip mine coal in certain areas. Swaney Company sought a depletion deduction which was refused by the Tax Court, saying no depletable interest passed from Vincent to Swaney.

The Court vacated the order of the Tax Court, and allowed the depletion deduction to the Swaney Company, holding that when the compensation of the producer was dependent upon the sales price of the coal, and the possibility of profit depended solely upon the extraction and sale of the product, the strip miner had an economic interest in the coal.

This case established two criteria for the allowance of the depletion deduction, namely: (1) the price paid to the stripper must depend on market price and conditions, and (2) the return of capital to the stripper must be dependent on the severance and sale of coal, not upon the covenant of the lease owner.

The Third Circuit dealt with the issue in Commissioner of Internal Revenue v. Mammoth Coal Company, 1955, 229 F.2d 535, 539. This case involved a strip mining contract, and on the facts of that case, citing Gregory (supra), the Third Circuit held that the strip miner had made a capital investment in buildings and machinery and that "the stripper had to look to the coal which it mined for return of the investment", and allowed the depletion deduction to the stripper. The criterion here clearly spelled out was that the strip miner must have a capital investment in the job in order to be entitled to the depletion deduction.

A similar question to the one in these cases before the Court arose in Usibelli v. Commissioner of Internal Revenue, 9 Cir., 1955, 229 F.2d 539. There, however, the case involved a strip mining contract between a strip miner and the United States, and the contract was for a specific period, for specific tonnages, for specific sums. The Court cited the criteria stated above and the facts, and denied the depletion deduction, saying that the taxpayer's gain depended not on the severance and sale of the coal, but upon the covenant of the United States to pay him for his work, thus establishing that a mere contract of hire, although it may constitute an economic advantage, will not support the depletion deduction, as it does not constitute an economic interest.

Weirton Ice and Coal Supply Company v. Commissioner of Internal Revenue, 4 Cir., 1956, 231 F.2d 531, was also a case on depletion deduction and strip miners.

Weirton, the strip miner, under contract with National Steel Corporation, spent $30,000 on roads for the job, and $500,000 on machinery and equipment to be used for the production of coal. The Fourth Circuit there held that Weirton had an economic interest, stating that the fact that there was a termination clause was of no importance, because Weirton actually mined all the coal in the areas, and that the expending of $500,000 indicated that, at least in the contemplation of the parties, Weirton had the right to mine all the coal; finally, the Court stated that Weirton's rights to compensation depended solely on the extraction and delivery of the coal, and that the relationship of the parties (National and Weirton) gave Weirton an economic interest and allowed a depletion deduction, following Gregory and citing Mammoth. The Usibelli case was distinguished upon its facts. This decision was based upon the criteria that the parties must intend that the stripper mine the deposit to exhaustion, and that the parties must not intend the contract to be terminable at will.

After the Weirton case came Commissioner of Internal Revenue v. Hamill Coal Corporation, 4 Cir., 1956, 239 F.2d 347, 349. There, the Hamill Coal Corporation entered into contracts with Daniel Coal Company. Daniel agreed to strip mine certain areas, build and maintain roads, and had purchased and committed expensive equipment to the job. These factors, plus the necessity of the sale of the coal for the return of Daniel's investment, since Hamill would only take the 16,000 tons per month "if market conditions permitted", were considered determinative, and citing the authorities reviewed above, the Court held that this agreement satisfied the criteria for economic interest, and allowed Daniel the depletion deduction.

Hamill was followed by Stilwell v. United States, 4 Cir., 1957, 250 F.2d 736, 739. There, the Stilwells, trading as the Bear Ridge Coal Company, entered into an oral contract to produce coal for Paragon Jewel Coal Company, Inc. The terms of the oral contract were found by the Court to be that the Stilwells were to extract all mineable coal from the boundaries allocated to them, and to deliver the same to the Paragon tipple at their expense. The Stilwells agreed to build a road, put up buildings required for the strip mining operation, provide engineering service, and to deliver the coal to Paragon exclusively, unless Paragon allowed them to sell it to some other company. The amount of coal to be delivered was indeterminate, but Paragon agreed to pay a specific price for the coal per ton, it being understood that this price could be raised from time to time. The price paid was actually varied according to labor costs and the market price of coal. The Stilwells carried out the agreement, and over the period of four years, during which the contract was in effect, they tripled their investment in machinery (which could be removed from the site after completion of the job). Although there was no specific term mentioned in the oral agreement, the Court found from the conduct of the parties, as set out

above, that they did not mean for it to be terminable by Paragon as long as the work was properly executed. The Court held on these facts, citing the authorities set out above, that:

"This is not a case where the contract is clearly terminable at the will of either party and where the contractor's income is dependent upon the personal covenant of those with whom he has contracted without regard to the price at which the coal is sold."

and authorized the depletion deduction.

After the Stilwell case came Parsons v. Smith, 3 Cir., 1958, 255 F.2d 595 and Huss v. Smith, 3 Cir., 1958, 255 F.2d 599. In Parsons, the Third Circuit refused to allow the depletion deduction to a road building contractor who undertook a stripping job in between roadbuilding contracts. That contractor insisted upon a ten day termination clause and a guaranteed price for coal, not to be varied with the market. These provisions of the contract were considered the most salient, and the Court held that they precluded the finding of an economic interest in the contractor. In Huss, the Court held that a fixed price per ton coupled with a thirty day termination agreement, and no sufficient indication of the existence of an economic interest in spite of these terms, precluded the finding of an economic interest and, therefore, denied the depletion deduction. The facts in Parsons and Huss, supra, are substantially different from the facts in the cases before the Court and the cases cited herein where depletion was allowed.

Applying the facts of the cases at bar to the criteria enunciated by the precedents cited above where the facts were similar, it is apparent that the criteria for the establishment of an economic interest in the coal in place are present here.

 This is a tax case, and "In the field of taxation, administrators of the law and the courts are concerned with substance and realities, and formal written documents are not rigidly binding". Helvering v. F. & R. Lazarus & Co., 1939, 308 U.S. 252, at page 255, 60 S.Ct. 209, at page 210, 84 L.Ed. 226.

The Court is of the opinion that under all the facts in this case, the Partnership had an economic interest in the coal in place which entitles it to the claimed depletion allowance, and an order will be entered accordingly.