Paul E. Barry, Inc. v. Commissioner.
Paul E. Barry, Inc. v. Commissioner
Docket No. 45600.
United States Tax Court
T.C. Memo 1955-12; 1955 Tax Ct. Memo LEXIS 327; 14 T.C.M. (CCH) 37; T.C.M. (RIA) 55012; January 24, 1955
David Berger, Esq., and Leon H. Kline, Esq., for the petitioner. William G. Handfield, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the fiscal years ending August 31, 1947, 1948, and 1949 in the aggregate amount of $5,135.68. Petitioner no longer contests any of the adjustments that resulted in the deficiencies. However, it contends that it should have been allowed deductions for depletion in each of the years involved. If such claimed deductions are allowable, they will not only eliminate the deficiencies but petitioner will have overpaid its taxes for each of the years. The question is whether petitioner had a depletable interest in coal *328 which it strip mined pursuant to contract with the Comfort Run Coal Company. Findings of Fact A stipulation of facts filed by the parties is hereby adopted as part of the findings and is incorporated herein by this reference. Petitioner, Paul E. Barry, Inc., is a corporation organized as of September 1, 1946, under the laws of the Commonwealth of Pennsylvania, with principal place of business in Richland, Pennsylvania. It filed its corporate income tax returns for the fiscal years ending August 31, 1947, August 31, 1948 and August 31, 1949, with the collector of internal revenue for the first district of Pennsylvania. Prior to petitioner's incorporation, one Paul E. Barry (hereinafter called "Barry") entered into a written contract with the Comfort Run Coal Company, a partnership (hereinafter called "Comfort") whereby Barry was to strip mine tracts of land held under leases by Comfort. Barry performed strip mining services under the aforesaid contract beginning in July of 1944. On completion of the services covered by the written contract Barry and Comfort entered into various oral agreements whereunder Barry strip mined coal on other tracts leased to Comfort. Petitioner was *329 formed to carry on activities formerly carried on by Barry. It also strip mined coal for Comfort under oral agreements. Some of the agreements under which petitioner strip mined for Comfort had been made prior to petitioner's formation and had been assigned to petitioner by Barry, while others were made directly with Comfort subsequent to petitioner's formation. Petitioner's strip mining operations for Comfort were in areas known as Beaver Valley and Grass Flats, both located in the Commonwealth of Pennsylvania. Comfort acquired additional tracts within these areas from time to time, and at such times new oral agreements would be made respecting the strip mining of such tracts by petitioner. Before acquiring any new tract representatives of Comfort would examine it to see if there were coal deposits of sufficient promise to justify acquisition of the lease. After acquiring the lease Comfort would ask petitioner to strip mine the tract. Petitioner would then examine the premises and determine, independently of the prior examination by Comfort, whether it would be economically feasible to do so. Petitioner was always free to refuse to work a tract if it felt that it would not be *330 in its own best interests. Upon deciding to strip mine a tract, petitioner would construct and maintain roads, clear away trees and brush and remove the overburden. The overburden is the soil and other material on top of the coal to be mined, and was of an average depth of 30 to 35 feet on the tracts on which petitioner strip mined for Comfort. Comfort would inform petitioner of the amount of coal it required for whatever period in the future it had a foreseeable need. Petitioner would then attempt to produce sufficient coal to meet such requirements, and generally mined enough coal to have approximately a 30-day advance supply on hand. If coal produced by petitioner was rejected by Comfort, petitioner had the right to sell such coal elsewhere, and did in fact during the tax years in question make some small sales of such coal to parties other than Comfort. After delivery of coal to its tipple, Comfort would pay petitioner and in turn sell the coal to its (Comfort's) customers on its own behalf. Petitioner received no compensation from Comfort during the years in question other than as described above. Petitioner's scope of operations in regard to the coal was to mine and clean *331 it, load it on trucks and deliver it to the tipple owned and operated by Comfort. Comfort paid petitioner a per-ton price for coal so delivered. This price was always reached by negotiations, there having been at no time a fixed price even as to all the coal from a single tract. The factors entering into this price included the quality of the coal, the distance transported from the mine field to the tipple, the difficulty of production, and the market price. There was no set formula as to the effect of market price changes, but petitioner generally enjoyed about 75 per cent of any increase and absorbed about 75 per cent of any decrease. During the tax years in controversy petitioner received from Comfort for coal delivered to the tipple the following amounts: Year ending August 31, 1947
$565,705.80
Year ending August 31, 1948
729,417.88
Year ending August 31, 1949
598,915.47
Petitioner used equipment on the tracts of Comfort of the approximate value of $350,000 during the period in controversy. It also constructed buildings to house such equipment and buried several large storage tanks in the ground for fuel oil and gas. The average number of employees working *332 for petitioner on these tracts during this period was about fifty. In 1948 petitioner had removed the overburden from 10,000 tons of coal which could not at that time be sold by Comfort. Petitioner thereupon discontinued strip mining that particular tract, left the coal in place with the overburden removed and continued its operations on a different tract. In 1950 a customer was found by Comfort for this coal and petitioner was paid therefor by Comfort on a per-ton basis. The price so paid was arrived at by negotiation as had been done in prior years, and was reached and paid before Comfort closed its sale to its own customer. The laws of the Commonwealth of Pennsylvania required that areas which had been excavated by strip mining be filled in and replanted with trees. The cost of this "backfilling" was borne by petitioner as follows: The cost was estimated at $120 per acre, which was determined to average 4 cents per ton of coal mined. When paying petitioner Comfort would deduct and withhold 4 cents per ton from the agreed price. Thereafter, when and as petitioner would backfill, Comfort would pay to petitioner $120 for each acre of land backfilled. Petitioner did not backfill *333 all areas which it had mined and consequently did not receive from Comfort all of the money so withheld. The oral agreements between petitioner and Comfort, including those assigned by Barry, were not for any specific term. Each such contract gave petitioner the exclusive right to strip mine the tract covered therein until the coal was exhausted or it was no longer economically feasible to continue. Comfort had the right to purchase the coal before it could be offered for sale to another, but any coal rejected by Comfort could be sold by petitioner on the open market. Petitioner had a depletable economic interest in the coal in place. Opinion RAUM, Judge: The sole question at issue is whether petitioner acquired an economic interest in the coal in place entitling it to a depletion allowance on its gross income derived therefrom pursuant to Sections 23(m) and 114(b) of the Internal Revenue Code of 1939. The cases in this field have turned upon rather elusive distinctions, and it is not always easy to reconcile the various decisions. However, we think that the instant case is not significantly different from James Ruston, 19 T.C. 284, and Helen C. Brown, 22 T.C. 58. *334 Cf. Mammoth Coal Co., 22 T.C. 571; J. E. Vincent, 19 T.C. 501, reversed in part sub nom. Commissioner v. Gregory Run Coal Co., 212 Fed. (2d) 52 (C.A. 4). Petitioner assumed the risk of the enterprise, and had to look solely to the extraction and sale of coal for its return on investment and profit. The price which petitioner received varied with a number of factors one of which was the market price of the coal, and it generally enjoyed any increases or absorbed any decreases in market price to the extent of about 75 per cent. Taking all the circumstances into account we think that petitioner had a depletable interest such as was recognized in the Ruston and Brown cases. Decision will be entered under Rule 50.