C. A. Hughes & Company v. Commissioner.
C. A. Hughes & Co. v. Commissioner
Docket No. 44917.
United States Tax Court
T.C. Memo 1955-51; 1955 Tax Ct. Memo LEXIS 287; 14 T.C.M. (CCH) 172; T.C.M. (RIA) 55051; March 9, 1955
*287 Jerome H. Simonds, Esq., and Arnold Levy, Esq., Washington Building, Washington, D.C., for the petitioner. James A. Anderson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies of $5,145.02 and $9,522.12 in the petitioner's income tax for 1947 and 1948, respectively. The issues for determination are the correctness of the respondent's action (1) in determining that the amounts paid by petitioner during the taxable years to a strip mining contractor are to be excluded from the petitioner's gross income from a certain coal mine in determining depletion allowances on the percentage basis, and (2) that in determining petitioner's net income for 1948 from various coal properties for percentage depletion purposes a deduction is to be taken in the case of each property of a pro rata portion of certain receivership fees paid by petitioner. Findings of Fact General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner is a Pennsylvania corporation with its principal office in Cresson, Cambria County, Pennsylvania. For each of the taxable years here *288 involved the petitioner maintained its books and records on the accrual basis of accounting and filed its income tax returns on a calendar year basis with the collector for the twenty-third district of Pennsylvania. During the taxable years in controversy, and for a considerable period prior thereto, petitioner was engaged in the mining, production and sale of bituminous coal. Its products are marketed principally in the northeastern part of the United States, while its specialty product, blacksmithing coal, is sold in almost every state in the United States. Prior to 1946 petitioner sold coal, which it mined and produced, through its own sales organization. Since that time all coal mined and produced by petitioner, except blacksmithing coal, has been sold by Winslow-Knickerbocker Coal Company of Philadelphia, Pennsylvania, pursuant to a sales agency agreement between that company and the petitioner. All of the coal sold by petitioner during 1947 and 1948 from its Lilly No. 5 mine, hereinafter referred to more particularly, was sold through Winslow-Knickerbocker. Issue 1. Payments to strip mining contractor Findings of Fact Argyle Coal Company, sometimes hereinafter referred *289 to as Argyle, has been engaged in the production of bituminous coal for many years, operating in the same field as petitioner. Since about 1900 Argyle has been a lessee of Bethlehem Steel Company. For a number of years the coal lands owned by petitioner in fee have been in the same general area as those of Argyle and of Bethlehem and certain of its subsidiaries, sometimes referred to as the Bethlehem interests. Because petitioner's lands were intertwined with those of the Bethlehem interests, it has had dealings with them extending over a long period. In 1944 petitioner negotiated a large lease from Bethlehem of a deep seam of coal, known as B seam coal, which it is still mining by the deep or underground method. Prior to 1946 petitioner had engaged exclusively in deep mining. Early in 1946 petitioner's management concluded that there was E seam coal (geologically about 200 feet above B seam coal) in lands owned by the Bethlehem interests susceptible of being mined by the strip method. This coal was in the fringe of deep mine workings of Argyle. Petitioner did not know whether Argyle had rights to mine the E seam coal and contacted Bethlehem about obtaining them. Since Bethlehem *290 was in doubt as to the matter, it advised petitioner to negotiate directly with Argyle. By an agreement, dated September 10, 1946, Argyle agreed to lease to petitioner the above-mentioned E seam of coal which subsequently became part of the operation known as petitioner's Lilly No. 5 mine. Simultaneously with the execution of the agreement, Bethlehem gave Argyle stripping rights. By this time petitioner had obtained the necessary rights-of-way in order to strip mine the coal. Petitioner obtained from the Pennsylvania Department of Mines a registration certificate required for the strip mine operations and posted the requisite surety bonds to guarantee the restoration of stripped areas. Petitioner made surveys for, and developed, a drainage plan for the disposition of mine water without stream pollution. It also obtained from the Pennsylvania Sanitary Water Board a permit for the disposition of mine water in accordance with the plan. The agreement of September 10, 1946, the first of three leases between Argyle and petitioner for the strip mining of coal, recited the ownership of the mineral rights by the Bethlehem interests, and conveyed to the petitioner the right of removing and *291 carrying away designated areas of E seam coal by the stripping method, along with all the necessary rights and privileges for that purpose. By the agreement Argyle was released from any claim for damage that might result from the stripping of the coal. Under the agreement petitioner was obligated to conduct the operations in a work-manlike manner and to pay Argyle a royalty of 35 cents per net ton for all coal stripped and removed. The royalty was based on the then market price of $3.85 per ton for such coal. In the event the then market price of the coal declined, the royalty was subject to reduction but in no event to a reduction of more than 10 cents per ton. By the contract petitioner was to confine the water arising from the stripping operation to a stated watershed. In addition, the petitioner was required to have any contract made by it with a stripping contractor provide that the contractor was obligated to comply with the Pennsylvania statutes relating to the conservation of lands which have been strip mined and those relating to stream pollution. The agreement also provided that six months after its execution it might be canceled and terminated by either Argyle or the petitioner *292 on 60 days' notice. Prior to September 1946 petitioner had never done any strip mining and, consequently, did not own any strip mining equipment. If it had engaged in the actual stripping operation at the Lilly No. 5 mine, it probably would have been required to make an investment of about one-half million dollars in dirt moving equipment. In September 1946 petitioner was in receivership and did not have funds for making that type of investment. In the coal field in which the above-mentioned E seam of coal was situated were a great many contractors who prior to World War II had been engaged in road building. With the advent of World War II and the cessation of road building, they contracted to do strip mining of coal and used their equipment for such work. Among these were S. J. Groves & Sons Company, sometimes hereinafter referred to as Groves. During the time petitioner was negotiating the above-mentioned agreement with Argyle, Groves was engaged in a strip mining operation near the above-mentioned E seam of coal and was nearing completion of the operation. When the necessary papers incident to petitioner's agreement with Argyle were being prepared, and in August 1946, petitioner *293 approached Groves with the view of getting it to strip mine the E seam of coal. Groves was acquainted with the circumstances and conditions under which petitioner was acquiring the rights to strip mine the coal. In negotiating the price Groves would receive for stripping the coal, petitioner was faced with the fact that O.P.A. controls were in effect and the maximum selling price of the coal was $3.85 per ton, that from that price, 35 cents per ton would have to be paid to Argyle as royalty and 20 cents per ton for selling commissions. Both Groves and petitioner had considerable doubts as to whether the operation could be conducted profitably. As a consequence, they agreed that either Groves or the petitioner could, at any time either desired, terminate such contract as they might enter into with respect to the operation. Groves, faced with rising operating and labor costs, hesitated to agree to strip mine for less than $3 per ton and petitioner hesitated to agree to pay $3 per ton. Their differences were resolved by the petitioner agreeing to the $3 per ton desired by Groves and by the parties agreeing that their relationship under such strip mining contract as they might enter *294 into with respect to the operation should be such that Groves would not be entitled to a depletion allowance with respect to the operation. On September 10, 1946, and subject to the above-mentioned agreements respecting termination and depletion, petitioner and Groves entered into a contract whereby Groves agreed to strip mine the E seam coal according to the best practices of strip mining. By the contract Groves was to strip the coal using its own equipment and labor, deliver the coal to the petitioner at a tipple owned by petitioner, then run it through a cleaning plant constructed of materials furnished by petitioner and erected by Groves, and then in properly cleaned condition on to railroad cars at the tipple. For its services Groves was to be paid an agreed price per ton, the basis of which was set forth in the contract as follows: "7. * * * Any coal passing inspection and placed into railroad cars shall be accepted by the operator [petitioner] as clean and marketable coal and paid for accordingly and the contractor's [Groves'] responsibility for the condition and quality of said coal shall cease when it is delivered into the railroad cars after being passed through the *295 cleaning plant. "8. The parties hereto agree that the contractor shall receive from income derived from the sale of said coal the sum of Three ($3.00) Dollars per net ton for each ton of marketable coal mined and loaded onto railroad cars as aforesaid; said payment shall be made on the basis of Pennsylvania Railroad Company weigh bills, access to which shall be freely granted to the contractor or his agents by the operator at any time when so desired. The operator will act as shipper of the coal and be responsible for all phases of the work pertaining thereto from the time when said coal is placed in the railroad cars. "9. The aforementioned sum of Three ($3.00) Dollars per net ton has been determined on the basis of a maximum price classification of Three and 85/100 ($3.85) Dollars per net ton of prepared coal F.O.B. railroad cars. In the event of an increase in price classification over the above or aforesaid Three and 85/100 ($3.85) Dollars for the sale of the said coal seventy-five (75) per cent of the increase shall be added to the aforesaid sum of Three ($3.00) Dollars per net ton and paid to the contractor as hereinbefore provided." Under the contract the petitioner was *296 obligated to indemnify Groves against any liability arising out of damage to the surface of the land and was to furnish all rights-of-way and easements. Groves was obligated to comply with the laws of Pennsylvania relating to strip mine operations and stream pollution. Groves also was obligated to keep itself insured under the workmen's compensation law and to carry adequate public liability insurance for injuries to persons and damages to property in the course of the operation. Groves also assumed liability for the payment of five cents per ton to the Health and Welfare Fund of the United Mine Workers of America in the event it was found that such payment was applicable to the coal produced under the contract. On December 1, 1947, the petitioner, effective as of July 1, 1947, assumed the latter obligations. The contract did not contain any provisions respecting the quantity of coal to be mined by or at any given time or during any given period or periods, nor did it authorize Groves to mine any coal except that to be delivered to petitioner. Groves was not authorized to sell any of the coal to anyone. The contract of September 10, 1946, between Groves and petitioner was terminable *297 at will by either party. On July 12, 1947, petitioner and Argyle executed a second lease which amended the first Argyle lease of September 10, 1946, and covered E seam coal in a tract immediately adjacent to the E seam coal in the tract covered by the first lease. On August 12, 1948, petitioner and Argyle executed a third lease which amended the first and second Argyle leases and covered D seam coal which underlay the E seam coal referred to in the second Argyle lease. The terms and conditions of the second and third Argyle leases were substantially the same as those in the first lease. The coal lands covered by the three leases collectively are sometimes referred to herein as petitioner's Lilly No. 5 mine or property. Petitioner employed Groves to extract the coal covered by the second and third Argyle leases. This employment was under the same terms and conditions surrounding, and contained in, their contract of September 10, 1946, applicable to the extraction of coal under the first Argyle lease, except to the extent previously modified, and except, further, that since extraction under the third Argyle lease entailed costs additional to those under the earlier leases, the parties *298 entered into a supplemental agreement by letter, under date of October 18, 1948, which provided, in part, as follows: "Therefore, on coal mined from Gallitzin, we [petitioner] will pay you [Groves] $3.1825 per net ton on coal shipped to the Consolidated Gas, and $3.35 per net ton on coal shipped to Winslow-Poe Classification. "In addition to this, we will make monthly settlements, paying you one-half of the added cost of trucking, or 12 1/2 cents per ton, on all coal mined from the 'D' Seam, and one-half of the cost of weighing, or four (.04) cents per load on all coal mined from Gallitzin. "The other terms of our agreement with you, and the modifications thereto, to be continued in full force and effect." In carrying out the provision of the contract of September 10, 1946, between petitioner and Groves that Groves should receive its compensation "from income derived from the sale of said coal [extracted by it]," the petitioner paid such compensation, and Groves accepted payment, from petitioner's general corporate funds. Such payments were made before the end of the month following that in which the coal was loaded on the railroad cars, and were made irrespective of *299 whether the coal had been sold by petitioner's sales agent. No segregation was made on the books of the petitioner respecting the sale of coal extracted by Groves. During 1947 and 1948 there were a number of occasions when Groves agreed to accept lesser compensation than that provided for in the agreement of September 10, 1946. Groves did so in order to enable petitioner currently to sell the coal and thereby make it possible for Groves to continue mining operations. Coal extracted and sold on these occasions was at prices substantially below the maximum O.P.A. selling price for such coal set out in the contract of September 10, 1946. Groves' stripping equipment was found to be incapable of extracting the coal in certain spots or sections at what Groves considered a reasonable cost. Such coal was extracted by petitioner with equipment obtained by it and was sold by petitioner without Groves having any right to compensation with respect thereto. Petitioner did all of the engineering in connection with the Lilly No. 5 operations, including surveying, location of cuts, working out a plan of production and working out a drainage plan. Petitioner exercised complete supervision over *300 the operation of the Lilly No. 5 property. Its vice-president in charge of production was there daily, and petitioner kept a coal inspector there. Petitioner determined the amount of coal to be mined, told Groves when it could, and when it could not, work. Groves' labor foreman contacted petitioner each night for instructions as to whether Groves could work the following day. Under the contract between petitioner and Groves, the latter was to do, and did, the back filling of the mined out area and petitioner was to do, and did, the reforestation, all as required by the laws of Pennsylvania. Insofar as safety matters with respect to the Lilly No. 5 mine were concerned, petitioner, as operator, was looked to as the responsible party for compliance with the laws of Pennsylvania. Petitioner's gross receipts from sales of coal from its Lilly No. 5 mine were $600,245.65 in 1947 and $742,314.78 (including $9,873.44 received as royalties) in 1948. Petitioner, as lessee, paid Argyle royalties of $53,298.59 in 1947 and $58,983.88 in 1948. Petitioner paid Groves as compensation for its services in 1947 and 1948 the amounts of $459,305.36 and $507,129.11, respectively. In determining the *301 deficiencies here involved, the respondent determined that the amounts paid Groves should be excluded from petitioner's gross income from the Lilly No. 5 mine in determining depletion allowances on the percentage basis for the respective years. Groves had no economic interest in the coal it mined during 1947 and 1948 from the petitioner's Lilly No. 5 mine. Opinion The issue here is whether, in computing petitioner's percentage depletion allowances for the years in controversy, the amounts paid to Groves for strip mining fringe coal are to be excluded from petitioner's gross income from the Lilly No. 5 property. The determination of that question depends on a determination of whether Groves, by reason of the arrangements entered into with the petitioner, had an economic interest in the coal or the proceeds from its sale. The parties are in agreement as to the amounts of the petitioner's allowances for depletion with respect to the Lilly No. 5 property for the years in question in the event it is found that Groves had an economic interest in the coal or in the proceeds from its sale. They are also in agreement as to the amount of such allowances in the event it is found that it *302 did not have such interest. All the petitioner's leases from Argyle to petitioner relating to the Lilly No. 5 property were terminable by either party after six months from the date thereof and upon 60 days' notice. With that back drop and for reasons satisfactory to themselves, Groves and petitioner made their contract of September 10, 1946, and subsequent arrangements, for the extraction of coal from the property, terminable by either party at will. The contractor acquires no economic interest in the coal under contracts or arrangements which are so terminable. ; . The rationale of those cases is applicable here. Accordingly, we have found that Groves did not acquire an economic interest in the Lilly No. 5 coal or the proceeds from its sale. The holdings in ; ; and , certiorari denied , reversing , relied on by respondent, are not applicable here because of factual differences. In *303 view of the foregoing, we conclude that the amounts paid Groves are not to be excluded from petitioner's gross income from the Lilly No. 5 property in computing the petitioner's percentage depletion allowances with respect to that property. Issue 2. Receivership fees Findings of Fact From February 1945 to May 24, 1948, the petitioner was in receivership. R. H. Moore, the present president of petitioner, and who had participated in the formation of the petitioner in 1932 and had been connected with it from its organization, served as receiver during the pendency of the receivership. C. R. Hughes also participated in the formation of the petitioner and owned 30 per cent of its stock. Difficulties arose between Hughes and Moore and difficulties and misunderstandings arose between them and a group of others. Such difficulties and misunderstandings brought petitioner to the position where it could not operate. This situation resulted in the receivership. During the course of the receivership a nominee of Hughes filed exceptions to certain accounts which Moore, as receiver of petitioner, had filed with the Cambria County Court, Ebensburg, Pennsylvania. In connection with the filing *304 of the exceptions Hughes employed counsel. During the period of the receivership Hughes frequently consulted the receiver and advised with him and spent time with him "on various matters connected with the general problems of the business." Hughes requested the receiver to pay him for his services, and while the receiver was willing to pay what he considered was a reasonable sum, Hughes requested more. No hearing was had by the court on the exceptions which had been filed against the receiver's accounts, as the receivership was terminated as a result of all matters requiring a continuation of the receivership and the continued supervision of the court having been disposed by amicable agreement of all persons interested in the petitioner. The order and decree of the court of May 24, 1948, discharging the receiver and terminating the receivership directed that the following payments be made by petitioner: $15,833.33 to the receiver for his services, $7,500 to the attorneys for the receiver as counsel fees, $2,500 to Morton Meyers, attorney for the exceptants, "for services in connection with the Receivership," and $6,000 to Hughes "for services rendered by him during the Receivership. *305 " In its income tax return for 1948 the petitioner reported a total gross income for the year of $3,002,246.03. Of that amount, $2,996,615.98 was shown as having been derived from petitioner's operation of four coal mines. The remainder, $5,630.50, was shown as having been derived from royalties, capital gain, rents and from miscellaneous sources. For the purpose of determining its net income from its respective mining operations for the computation of its percentage depletion allowance, petitioner allocated an amount of $25,166.76 of receiver's fees and expense (which, so far as appears, included the $15,833.33 and the $7,500 directed by the court on May 24, 1948, to be paid to the receiver and to his attorneys, respectively) to its various mining operations. However, it treated the amounts of $2,500 and $6,000 directed by the court to be paid to the attorney for the exceptants and to Hughes, respectively, as a miscellaneous deduction. In determining the deficiency for 1948 the respondent made no change in the petitioner's allocation of the $25,166.76 of receiver's fees and expenses but determined that, for the purpose of computing petitioner's net income from its respective mining *306 operations for the computation of the percentage depletion allowance, the abovementioned $2,500 and $6,000 should be allocated to each of the mining properties on the basis of the units of production obtained therefrom. Opinion There is no controversy as to the allocation made by petitioner of the $25,166.76 of receiver's fees and expenses. Nor does either party contend that the $8,500, composed of the $6,000 payment to Hughes and the $2,500 payment to the attorney for the exceptants, was not a deductible expense in determining petitioner's net income subject to tax. The controversy is as to the respondent's determination as to the treatment to be accorded it in determining petitioner's depletion allowance. Relying on testimony of Moore, who was the receiver and now is president of petitioner, to the effect that he was not able fairly to relate the $8,500 payment to any mining activity of the petitioner, and upon the holding in Tennessee, the petitioner contends that we should conclude that the respondent's determination was erroneous. The respondent, relying on the holding in , petition *307 for review dismissed , contends that his action was correct and should be sustained. The evidence shows that the petitioner was placed in receivership because it had been reduced to a condition where it was unable to operate as a result of difficulties between Hughes and Moore and difficulties and misunderstandings between them and others. Although the record is not clear with respect to his jurisdiction, we conclude the receiver was placed in charge of all of petitioner's properties and business and not a portion of them. Of the $8,500, $6,000 was paid to Hughes for the services rendered by him to the receiver during the receivership and $2,500 was paid to the attorney for the exceptants for services rendered during the receivership. Although the receiver stated that he was unable to relate the $8,500 to any mining activity, the circumstances presented show that it related to the conduct and operation of the petitioner's business. Concededly, petitioner's business was the mining, production and sale of coal. While approximately $5,600 of its gross income of more than $3,002,000 for the year was derived from rents, royalties, capital gain and miscellaneous *308 sources, yet so far as the record discloses the amount so derived was from activities which were merely incidental to, and not in addition to, the mining, production and sale of coal. On the record before us we can not find that petitioner was engaged in any substantial activities other than its business of producing and selling coal. In , where it was not shown that the petitioner had any substantial business activities other than its business of producing and selling oil and other petroleum products, it was held that interest paid during the taxable year on Federal income tax deficiencies for prior years was an overhead expense attributable to the mineral properties upon which depletion was claimed and should be deducted from the gross income from the properties in computing the net income of the taxpayer therefrom for the purpose of determining the percentage depletion allowance. In Tennessee, the taxpayer in addition to mining and selling coal from lands which it owned, operated two commissaries, rented approximately 225 houses to employees, ran a theater and engaged in other business activities. *309 The question there was not whether certain indirect expenses should be allocated to the taxpayer's coal properties on which depletion was claimed but was as to the mann in which such indirect expenses were to be allocated between the various operations of the taxpayer. On the basis of opinion evidence submitted by taxpayer which was supported by convincing reasons, we approved the allocation claimed by taxpayer instead of that employed by respondent in making his determination. In view of what has been said above, we think that because of the factual differences involved the holding in Tennessee, is without application here. Since it does not appear that the petitioner had any substantial activity other than the production and sale of coal, we think the holding in , is applicable and controlling here. Accordingly, the action of the respondent with respect to this issue is sustained. Decision will be entered under Rule 50.