Hamill Coal Corporation, a Dissolved Corporation, Frank Correale, Palmer Correale and Fred Correale, Directors at the Time of Dissolution and Statutory Trustees v. Commissioner.
Hamill Coal Corp. v. Commissioner
Docket No. 35614.
United States Tax Court
T.C. Memo 1955-68; 1955 Tax Ct. Memo LEXIS 271; 14 T.C.M. (CCH) 218; T.C.M. (RIA) 55068; March 23, 1955
*271 Thomas P. Glassmoyer, Esq., and Fred L. Rosenbloom, Esq., 17th Floor, Packard Building, Philadelphia, Pa., for the petitioner. William G. Handfield, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency in the income tax of the petitioner for the year 1947 in the amount of $11,077.85. The sole issue for determination is whether the respondent erred in determining that the sum of amounts paid by petitioner during the taxable year to a strip mining contractor is to be excluded from the petitioner's gross income from a certain coal mine in determining depletion allowance on the percentage basis. Findings of Fact Some of the facts have been stipulated and are found accordingly. During the calendar year 1947 the petitioner was a corporation organized under the laws of Virginia. Petitioner was dissolved on November 10, 1948, pursuant to the provisions of section 3810 of the Virginia Code of 1930, and a certificate of dissolution was issued as of that date by the Virginia State Corporation Commission. Petitioner's board of directors at the time of its dissolution consisted of Frank Correale, *272 Palmer Correale and Fred Correale, who thereupon became trustees for the purpose of winding up petitioner's affairs pursuant to the authority vested in them under the laws of Virginia. On September 27, 1951, by order of the Chancery Court of the City of Richmond, Virginia, the authority of the foregoing statutory trustees to act in such capacity was extended for a period of five years. Petitioner filed a corporation income tax return for the calendar year 1947 with the collector of internal revenue for the district of Virginia. During the year 1947 petitioner was the lessee of certain coal mining lands, containing what is known as the Cedar Grove Seam, situated in Buchanan County, Virginia, and McDowell County, West Virginia, and was engaged in the mining, processing and sale of coal. Petitioner's leaseholds were acquired under two leases dated February 21, 1944, and April 30, 1946. The 1944 lease covered 150 acres of coal lands and permitted petitioner, as lessee, to remove all of the coal therein. The initial term of the lease was 12 years, beginning January 1, 1944, but petitioner was given the option to renew the lease for successive 12-year periods until all of the coal *273 in the Cedar Grove Seam was removed. In consideration of the lease, petitioner agreed to pay the lessee rent in the form of a tonnage royalty at the rate of 8 cents per net ton during the initial 12-year period and at the rate of 10 cents per ton for an additional 8-year period. Any coal remaining at the end of 20 years was to be paid for on a lump sum basis at the rate of 10 cents per ton. Petitioner, as lessee, was also required to pay all taxes assessed upon the leased premises and any state or Federal taxes imposed upon coal mined therefrom, was required to employ a competent mining engineer to maintain mining surveys, and was obligated to conduct its mining operations in accordance with the laws of the State of Virginia and the State of West Virginia, as the case might be. The 1946 lease covered 3.5 acres of coal lands in Buchanan County, Virginia, and was for a term of 10 years. In other respects the 1946 lease was substantially like the 1944 lease except that the tonnage royalty was 9 cents per ton for the entire term of the lease. During the year 1947 the strip mining of coal on the lands covered by said leases was performed pursuant to a written agreement between petitioner *274 and a partnership, consisting of F. B. Daniel and his wife, Olive A. Daniel, who before performing any work thereunder assigned their interest in the contract to Daniel Coal Company, which was a partnership consisting of F. B. Daniel and his brother, A. M. Daniel, A. L. Chris and W. T. Smith. Hereinafter the strip mining contractor is referred to as "Daniel." The strip mining contract provided, among other things, as follows: "THIS AGREEMENT made this 14th day of March, 1944, between HAMILL COAL CORPORATION, a Virginia corporation, party of the first part, hereinafter for convenience called Hamill, and F. B. DANIEL COMPANY, a partnership composed of F. B. Daniel and O. M. Daniel, party of the second part, hereinafter for convenience called Daniel, "WHEREAS, Hamill is the owner of that certain coal mining lease and the leasehold estate thereby created dated February 21, 1944, made by The National Shawmut Bank of Boston, a corporation, as Lessor, to Hamill, as Lessee, and recorded in the Clerk's office of Buchanan County, Virginia, in Deed Book 92, page 114, whereby what is known as the Cedar Grove Seam of Coal in and under certain lands in Buchanan County, Virginia, and McDowell *275 County, West Virginia, and certain surface tracts and rights, all of which are described in said lease, to which reference is hereby made, are leased to Hamill for coal mining purposes; and "WHEREAS, Hamill, as the lessee of said lands, has the right to commit waste upon said land by removing therefrom all or any part of the coal therein by the process of mining commonly called strip-mining, and has the absolute right to remove the earth, rock and other strata overlying said coal with steam shovels, drag lines and in any other manner whatsoever, and to cast the same in any convenient location on said land; and "WHEREAS, Daniel is the owner of excavating and hauling equipment suitable for use in strip-mining operations in and upon said land, and removing the coal therefrom, and is experienced in conducting operations of that character, and Hamill is desirous of employing Daniel as an independent contractor for the purpose of conducting strip-mining operations on said land upon the terms and conditions and to the extent hereinafter set forth; and "WHEREAS, said land which contains said seam of coal is not now accessible to a railroad and no tipple is located on said land for the *276 preparation and handling of coal produced therefrom, but the Norfolk & Western Railroad Company has agreed to construct and has begun the construction of a branch line from its present railroad line at Burke, Ky., Virginia, to a point on said leased premises where Hamill has lately begun the construction of a coal tipple, a distance of approximately two miles, and Hamill has agreed to complete the erection of such tipple for the preparation and handling of said coal as expeditiously as is reasonably possible; and "WHEREAS, it is the desire of the parties hereto to embody in this writing the terms of their agreement with respect to such matters. "NOW, THEREFORE, WITNESSETH, that in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows: "1. Hamill has begun the construction of said tipple and agrees to complete the same and have it ready for operation as expeditiously as is reasonably possible and approximately by the time said branch line of railroad is completed and ready for operation. "2. Hamill agrees to construct a road from said tipple up the mountain to said coal seam, a distance *277 of approximately two miles, and to complete the same without any delay which can be avoided by the exercise of reasonable diligence. Said road shall be built in a good and workmanlike manner and shall be suitable for use by trucks, automobiles, steam shovels and other equipment, and shall be used by Daniel in hauling coal to the tipple and in moving machinery and equipment. After said road has been properly constructed and completed, it shall be maintained in reasonably good repair by Daniel, but Hamill shall furnish all materials for the proper maintenance of such road. Any and all other roads which may be needed by Daniel in conducting said strip-mining operations shall be constructed and maintained by Daniel. "3. Daniel agrees to strip-mine all of the merchantable coal in the above mentioned seam of coal having an overburden of 40 feet or less. Daniel shall have the right to strip-mine coal with a heavier overburden if it shall elect to do so, but it shall not be obligated to do so. Daniel shall begin its strip-mining operations at a point at or near the end of the road to be constructed by Hamill as hereinabove stated, such point to be definitely located by Hamill. Hamill shall *278 also have the right to designate the location of stripmining operations. However, it is understood that such operations shall be as nearly continuous as is reasonably possible and without skipping from place to place, and the right hereby given to Hamill to designate the location of stripmining operations shall be exercised with due regard to the proper and economical operation of the work by Daniel, and shall not be exercised unreasonably or arbitrarily. Unless Hamill shall expressly otherwise require, Daniel shall conduct its stripping and mining operations as one continuous operation so far as is consistent with good, economical strip-mining practices. "4. Daniel shall deliver the coal at Hamill's said tipple, and shall at all times use its best efforts to load and deliver only clean coal, as free from rock, bone, slate and debris as is reasonably possible in strip-mining operations, to the end that such coal may be merchantable and marketable. Daniel shall furnish all equipment necessary for the stripping and mining operations and the loading and delivery of the coal to the tipple as aforesaid. Daniel shall also pay all property taxes on its equipment, all Social Security taxes, *279 compensation insurance, and shall carry and pay for proper liability insurance covering his scope of the work; and Hamill shall carry and pay for proper liability insurance covering his scope of the work. It being understood that Hamill shall not be put to any cost with respect to the removal of the overburden, mining, loading and delivery of the coal at the tipple, except as herein otherwise provided. "5. Hamill agrees to pay to Daniel for all coal delivered to its tipple as aforesaid, the sum of $1.60 per ton of 2000 pounds, such payments shall be based on railroad weights and payment for all coal delivered by Daniel to said tipple during each calendar month shall be made on or before the 25th day of the next succeeding calendar month. "6. In mining said coal, Daniel agrees that so far as is consistent with good strip-mining practices it will remove two partings of impurities contained in said seam and will not load or include the same in the coal delivered at the tipple as aforesaid. All overburden, as well as such impurities, shall be cast by Daniel at such places as may be most convenient and economical in conducting its stripping and mining operations. However, Hamill may *280 in writing designate a place or places upon which no overburden or other waste material shall be cast, but Hamill shall not exercise this right of designation arbitrarily or unreasonably so as to increase Daniel's cost of operation. Hamill agrees to save harmless Daniel from any and all loss, cost or damage whatsoever because of damage to the surface of said lands as a result of said strip-mining operations, and the casting of the overburden and partings. Daniel shall not be required to replace any overburden, or fill in any excavated places. * * *
"8. Hamill agrees to accept and Daniel agrees to furnish at said tipple not less than 16,000 tons of coal per month, beginning as soon as said railroad is completed and said tipple is ready for operation, if market conditions permit. It agrees to use its best efforts to market all coal produced by Daniel from said premises, and it agrees that in the sale and marketing of coal, it will always give preference to the coal produced by Daniel over any other coal which it may mine or have for sale over said tipple. Hamill also agrees as far as is reasonably possible to arrange for and keep on the track at said tipple a suitable number of *281 cars for the handling of coal produced by Daniel, to the end that Daniel's mining operations may be, as far as possible, continuous and without unnecessary delay and interruption. "9. This contract shall continue in force and effect for a period of one year from the date on which the first coal from said coal seam is loaded into railroad cars, and thereafter shall continue in effect from year to year; provided, however, that after the end of said first year, either party shall have the right to terminate this agreement by giving to the other party at least ninety days written notice thereof, in which event this agreement shall end on the ninetieth day after the giving of such notice; provided further, however, that if either party shall fail to perform any one or more of its agreements as herein set forth, the other party, if not in default, may give written notice of such default to the party in default, and if such default is not wholly remedied within ten days thereafter, then the party not in default shall have the right to cancel this agreement after fifty days written notice of its intention so to do." In accordance with the terms of the contract, petitioner at its own expense *282 constructed a tipple for the storage, processing, loading and unloading of coal strip mined by Daniel, railroad trackage connecting the tipple with a spur line, and approximately two miles of macadamized highway from the tipple to the place where the strip mining operation was to be conducted. Petitioner exercised supervision over the exact localities of the strip mining operation, and had and exercised complete control over the sales of all coal delivered to the tipple by Daniel. In accordance with the contract, it paid Daniel $1.60 per 2,000-pound ton for each ton delivered at the tipple. All payments to Daniel, either at that rate or at rates subsequently agreed upon, were made on or before the 25th day of each month subsequent to the beginning of mining operations under the contract. From time to time during the life of the contract petitioner made such payments to Daniel at varying rates, which varied rates were agreed upon by letter upon any occasion when it became necessary to adjust the rates in accordance with increases in Daniel's cost occasioned by changes in the wage scale applicable to Daniel's employees. Prior to the execution of the contract, petitioner through C. A. *283 Hamill had performed and completed all the prospecting and exploration work which preceded the obtaining of its leases. It also conducted all negotiations for necessary railroad facilities, and from time to time after the execution of the contract made improvements and enlargements to the tipple. All costs for road building, the construction of railroad facilities, and construction of the tipple, together with the cost of materials for maintenance of the road, were borne entirely by petitioner. In accordance with the contract, Daniel, who had prior thereto never engaged in mining operations but had been primarily a builder and grader of roadways and airports, furnished the necessary equipment to carry on the strip mining operation. F. B. Daniel had had prior to execution of the contract some experience at strip mining. Some of the road building and grading equipment used by Daniel in the strip mining operation had been owned and used by it or its predecessor in road and airport building contracting prior to the execution of the contract here involved. During the life of the contract, and while carrying on its obligations thereunder, Daniel purchased additional equipment for which *284 it paid $103,300.34. All such equipment, or such as remained usable at the expiration of the contract, was removed by Daniel and used by it subsequent thereto. The macadamized road constructed by petitioner was designed to reach directly to the first seam of coal to be strip mined, but it was discovered by Daniel that that seam was not of the size which it was represented to be by petitioner and it became necessary for Daniel to cut and grade an additional 800 feet of roadway around the mountain in order to reach a seam of sufficient size to warrant strip mining operation. During the life of the contract it became necessary for Daniel to widen and otherwise improve and maintain the paved roadway theretofore constructed by petitioner. All materials necessary thereto were furnished at petitioner's expense. Daniel also provided trucks for use in the hauling of coal from the seam being mined to the tipple. Such trucks were rented at Daniel's expense. Generally, the strip mining operation performed by Daniel amounted to the removal of the overburden from the coal seam to be mined, the cleaning of the surface of the coal seam, the loading of the coal into trucks, and the hauling of it to *285 the tipple. It also removed two partings of impurities which existed in the coal seam being mined. Such work completed and satisfied Daniel's obligation under the contract. When coal was unloaded at the tipple by Daniel, petitioner further cleaned and sized it. The sizing process at petitioner's plant consisted of passing the coal over sizing screens for the purpose of sorting it into three types: 2-inch nut and slag, 2X5-inch egg, and 5-inch block or lump. After the coal was sized it was passed over picking tables where refuse, slate and other impurities were removed by hand in order to make the coal marketable. The market price of coal produced by petitioner varied according to the size of the coal. The larger sizes commanded a higher price than the smaller sizes. Regardless of the quantities of the various sizes of coal which petitioner recovered from coal unloaded at the tipple by Daniel, petitioner paid Daniel at the rate from time to time agreed upon or before the 25th day of each month. During the life of the contract the price at which petitioner sold its coal fluctuated. No adjustments in the rate paid by petitioner to Daniel were at any time made because of such fluctuations *286 in prices. Daniel did not sell any of the coal it extracted from petitioner's lands, and it had no function to perform in connection with the selling of the coal placed upon the market by petitioner. All payments were made to Daniel regularly by petitioner's check. A permit was required to conduct strip mining operations in the State of West Virginia, which permit was obtained by petitioner. All real estate taxes assessed against the property upon which the strip mining operations were being conducted were paid by petitioner with no contribution thereto by Daniel. The contract was terminated by mutual agreement in September of 1947. The reason underlying its termination was that Daniel could no longer economically remove the overburden necessary to strip mine the remaining available coal with the equipment then possesed by it. In other words, Daniel had by the termination date substantially removed all of the coal available for strip mining with an overburden of less than 40 feet, although subsequent to the termination of the contract petitioner extracted by strip mining operation approximately 10,000 tons per month during the period from September 1947 to May or June of 1948. *287 During the calendar year 1947 petitioner's gross income from sales of coal derived from its leaseholds was $1,339,620.04. During the same year Daniel received the total sum of $583,044.70 from petitioner pursuant to the contract. During the same year petitioner paid royalties to its lessors in the total amount of $74,319.71. Under the contract, Daniel did not during the year 1947 possess an economic interest in the coal deposits in place on petitioner's leased lands covered by the contract. For the calendar year 1947 petitioner, not Daniel, possessed the economic right to a percentage depletion allowance upon coal in place on its leasehold lands covered by the contract based on its gross income from strip mining operation upon said lands without deduction or exclusion of the amounts paid to Daniel. Opinion The issue here is whether in computing petitioner's percentage depletion allowance for the year 1947 the amounts paid to Daniel for strip mining services are to be excluded from petitioner's gross income from the mining of the Cedar Grove Seam. Respondent's argument in the affirmative is based upon his contention that Daniel by virtue of the strip mining contract between *288 the parties derived an economic interest in the coal in place or the proceeds from its sale. Petitioner, on the other hand, contends that it alone possessed a depletable interest in the coal in place in the Cedar Grove Seam and that therefore amounts paid to Daniel for the strip mining thereof are not properly to be deducted from petitioner's gross income therefrom in computing the percentage depletion relating to that mine. It is clear from the record that Daniel had no right to, and did not, at any time look other than to petitioner for payment for its services. It had no right of ownership to any of the coal strip mined and could not sell it. It had no right to, and did not, receive payment in kind. Although the rate of payment by petitioner to Daniel was from time to time changed by agreement, such changes were in no instance related to petitioner's ability to sell the coal mined nor the market price thereof. These changes were brought about by factors affecting only Daniel. Petitioner received upon the market a varied and fluctuating price for coal dependent to a great extent upon its size and quality, yet its payments to Daniel were in nowise affected by the size or quality *289 of coal strip mined and unloaded by Daniel at the tipple. Payments to the strip mining contractor were made at fixed monthly intervals and were not dependent upon the market. Petitioner was entitled to, and did, generally supervise the strip mining operations. It designated the area in which such mining was to be conducted. Although it contracted to receive from Daniel 16,000 tons per month at the tipple, we conclude that had petitioner's market at any time failed to warrant receipt of such an amount it could under the contract refuse to accept that amount. Indeed, the contract as a whole indicates strongly that at the time of its execution Daniel was concerned with respect to petitioner's sale of produced coal only to the extent that such sales efforts be put forth by petitioner as would result in the least possible delay in the strip mining operation. This is entirely consistent with the general interests and rights of any independent contractor who desires, naturally, to perform his contract in a manner resulting in the least cost to him. In contending that Daniel possessed a depletable interest in the coal in place, respondent lays great stress upon the fact that Daniel made *290 a comparatively large investment in strip mining equipment. We do not view this fact as significant in the light of the other rights of the contracting parties. It is plain that Daniel or its immediate predecessor owned a portion of such equipment prior to the execution of the strip mining contract and that it had used the same in the general road building and airport construction contracting business prior thereto. It is also true that subsequent to the strip mining operations here involved such equipment, or so much thereof as remained usable, was used by Daniel in the conduct of other strip mining ventures. We are convinced that the facts here involved are virtually on all fours with Morrisdale Coal Mining Co., 19 T.C. 208, and Mammoth Coal Co., 22 T.C. 571. The reasoning behind those decisions is apposite to the instant case. The holdings in James Ruston, 19 T.C. 284; Helen C. Brown, 22 T.C. 58; and Gregory Run Coal Co. v. Commissioner, 212 Fed. (2d) 52, certiorari denied 348 U.S. 828, reversing J. E. Vincent, 19 T.C. 501, relied on by respondent are not applicable here because of factual *291 differences. Because of the foregoing reasons, we have found as a fact that Daniel did not possess an economic interest in the coal in place in the Cedar Grove Seam which it strip mined under contract with petitioner. It follows that petitioner is entitled in the computation of its depletion allowance for the year 1947 to include in its gross income from the Cedar Grove Seam amounts paid to Daniel for the year 1947 for strip mining operations. Decision will be entered under Rule 50.