COMMISSIONER OF INTERNAL
REVENUE, Petitioner,

v.

The MAMMOTH COAL COMPANY,
Respondent.

No. 11589.

United States Court of Appeals
Third Circuit.

Argued Oct. 17, 1955.

Decided Nov. 30, 1955.

Rehearing Denied Feb. 6, 1956.

Robert B. Ross, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Richard L. Levy, Philadelphia, Pa. (William T. Coleman, Jr., Philadelphia, Pa., Edgar J. Goodrich, Lipman Redman, Washington, D. C., for J. Robert Bazley, Inc. and John Schumacher, respectively, amici curiae, Dilworth, Paxson, Kalish &

Green, Philadelphia, Pa., Guggenheimer, Untermyer, Goodrich & Amran, Washington, D. C., on the brief).

Fred L. Rosenbloom, Philadelphia, Pa. (Thomas P. Glassmoyer, on the brief), Schnader, Harrison, Segal & Lewis,. Philadelphia, Pa., of counsel, for respondent.

John W. Bodine, Philadelphia, Pa. (Frederick E. S. Morrison, Philadelphia, Pa., for Jeddo-Highland Coal Company and the Anthracite Institute, amici curiae on the brief), Drinker Biddle & Reath, Philadelphia, Pa., of counsel.

Before McLAUGHLIN, KALODNER, and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The Commissioner of Internal Revenue appeals from a decision of the Tax Court[1] entered after a determination that for the fiscal years ended August 31, 1947, and August 31, 1948,· the taxpayer, Mammoth Coal Company, in determining its percentage depletion deduction, did not have to eliminate from gross income amounts paid to the Capparell Stripping · & Construction Company, Inc., (the stripper) for strip-mining coal on the taxpayer's property.

Since the operative facts in the two fiscal years involved are the same, the 1947 facts will be used in discussion.

In December, 1946, the taxpayer and the stripper entered into a written agreement whereby the stripper acquired an exclusive, indefinite right to strip-mine coal on certain property which the taxpayer owned.[2] During the fiscal year ended in 1947, the taxpayer received $1,-369,719.10 from the sale of coal mined under the agreement. Of this total the stripper received $655,929.03.

The taxpayer's position, which was upheld by the Tax Court, is that it should be permitted to use the $1,369,719.10 as its gross income figure in computing its percentage depletion deduction. On the other hand, the government contends that the stripper is entitled to percentage depletion deduction computed on the basis of the $655,929.03 which the stripper received from the mining operation, and, accordingly, the taxpayer must eliminate this same $655,929.03 from its gross income before computing the percentage depletion deduction, under Sections 23(m) and 114(b) of the Internal Revenue Code of 1939.[3]

All parties agree that *either* the stripper or the taxpayer, but not both, is entitled to a percentage depletion deduction in regard to the $655,929.03. Thus, if the stripper is entitled to the deduction, the taxpayer is not.

Under the applicable Treasury Regulation, an "* * * owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. * * * An economic

---

1. 1954, 22 T.C. 571.

2. The original agreement, amended several times to reflect price changes, continued in effect until April 15, 1949, when the parties executed a mutual release.·

3. "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

    *    *    *    *

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *" Int.Rev.Code of 1939, § 23(m), 26 U.S.C.A. § 23(m).

"§ 114. Basis for depreciation and depletion

    *    *    *    *    *

"(b) *Basis for depletion*

    *    *    *    *·    *

"(4) *Percentage Depletion for coal*

● * *

"(A) *In General.* The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property ● * *." Int.Rev.Code of 1939, § 114 (b) (4), 26 U.S.C.A. § 114(b) (4).

interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. * * *"[4]

■ The question of what constitutes an economic interest [5] has been presented to the various courts in numerous instances.[6] There is no general rule that a strip miner is or is not entitled to percentage depletion. The facts in each case determine the result.

■ In the Supreme Court's most recent decision involving percentage depletion, Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, it was pointed out that what one's interest in depletable property is called under state law and the nature of the instrument creating such interest is unimportant for federal purposes. The Court noted that the cost of the capital investment to the beneficiary of the depletion is unimportant. "It is the lessor's, lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest * * *." 328 U.S. at pages 34–35, 66 S.Ct. at page 867.

■ We think the interest which the stripper acquired in the case at bar was sufficiently significant to entitle it to percentage depletion.

Under the agreement the stripper was to excavate, remove, and dispose of all

---

4. "§ 29.23(m)–1. *Depletion of Mines, Oil and Gas Wells, Other Natural Deposits, and Timber; Depreciation of Improvements.*—Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

"Under such provisions, the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. * * * An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest." Treas.Reg. 111, § 29.23(m)–1, 26 Code Fed.Regs. § 29.23(m)–1 (1949 ed.).

5. The Regulation distinguishes between "economic interest" and "economic advantage." One who acquires the latter through an agreement with one who possesses the former is not entitled to the depletion deduction.

6. Some of these decisions are: Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Kirby Petroleum Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52; M-B-K Drilling Co. v. Commissioner of Internal Revenue, 10 Cir., 1952, 194 F.2d 221; Dearing v. Commissioner of Internal Revenue, 5 Cir., 1939, 102 F.2d 91; Weirton Ice & Coal Supply Co. v. Commissioner of Internal Revenue, 1955, 24 T.C. ——; Brown v. Commissioner of Internal Revenue, 1954, 22 T.C. 58; Morrisdale Coal Mining Co. v. Commissioner of Internal Revenue, 1952, 19 T.C. 208; Ruston v. Commissioner of Internal Revenue, 1952, 19 T.C. 284; C. A. Hughes & Co., 1955, 14 T.C.M. 172; Hamill Coal Corp. v. Commissioner of Internal Revenue, 1955, 14 T.C.M. 218; Paul E. Barry, Inc. v. Commissioner of Internal Revenue, 1955, 14 T.C.M. 37; Winfield Mining & Contracting Co., 1954, 13 T.C.M. 591.

538

earth and rock, or overburden, overlying the coal veins in the three tracts, to recover all salvageable coal so exposed, and to deliver all material extracted from the veins to petitioner at a specified price per ton, which would vary according to whether the materials were weighed before or after processing through a cleaning plant which the taxpayer was going to erect. Adjustments in the amount of per ton payments were to be made in the event of a general increase or decrease in the wages of employees in the Southern Field anthracite mines of Pennsylvania.

The land had been previously deep-mined and strip-mined, and the agreement stated that the taxpayer would not be liable in any way for removal of more overburden than was anticipated or for failure of the stripper to recover any coal. The record is silent as to what the expectations were concerning the anticipated amount of available coal.

The stripper had the exclusive right to mine coal in the areas embraced by the agreement. This exclusive right was not limited in time but was to continue indefinitely. The taxpayer did have the right to call for a suspension of mining operations, and in such event under certain conditions regarding time and notice the stripper was free to give up the mining operation, but this was his own choice and unless he voluntarily did so, the taxpayer, though calling for a suspension of operations, could not permit anyone else to mine the area. Thus, for all practical purposes, the stripper had the exclusive right to mine the area to exhaustion.

The stripper provided the necessary buildings, equipment, and machinery for the stripping operations. $4,842.72 was expended in erecting buildings and almost a million dollars worth of equipment and machinery was used. (Almost $800,000 worth was new, provided especially for performance of the work contemplated by the contract.)[7]

Although all extracted material was to be delivered to the taxpayer, the taxpayer specifically reserved the right to reject any and all coal or coal material delivered to it, and thereupon the stripper would be free to sell the rejected coal to anyone it pleased for its own account.

The taxpayer was obligated to pay the agreed price per ton *only* if it accepted the coal. If it did not accept the coal, there was no personal liability to the stripper for the work and operations in extracting the coal.

The stripper was not being paid as a "hired hand" would have been for labor performed. Its situation was entirely different. When the stripper removed coal and other materials from the ground, the taxpayer was entitled to receive it. But the taxpayer was not obligated to take it. If it chose not to, it owed the stripper nothing, and the stripper would be free to sell the coal to anyone at whatever price it could get. To put it another way, the taxpayer gave the stripper the exclusive right to mine coal and sell coal at the stripper's own expense and for the stripper's own account, reserving, however, to itself the right to buy any or all of the coal produced by the stripper.

Had the agreement provided that the stripper could mine the coal and keep for itself a certain minimum quantity while turning over the rest to the taxpayer, we think it would be clear under the decisions that both the stripper and the taxpayer would have an economic interest in the coal. See Helvering v. Twin Bell Oil Syndicate, 1934, 293 U.S. 312, 321, 55 S.Ct. 174, 79 L.Ed. 383.

The fact that, instead of retaining coal, the stripper received so much per ton for that coal which first had to be offered to and accepted by the taxpayer should make no difference, for in any

7. The agreement also contained provisions for termination in the event of bankruptcy or default by the stripper and for arbitration under certain circumstances. During the taxable years involved, the taxpayer paid all real estate taxes, employed watchmen to guard the property, and paid for power including that used by the stripper.

event the stripper had to look to the coal which it mined for return of its investment and profit.

On quite similar facts, the Fourth Circuit, in Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52, certiorari denied, 1954, 348 U.S. 828, 75 S.Ct. 47, reached the same result, and, we think, correctly.

Accordingly, the decision of the Tax Court will be reversed.

On Petition for Rehearing

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

PER CURIAM.

The crux of the petition for rehearing is that "The contractor's rights were at all times terminable by the taxpayer. The Tax Court so found, and the record amply supports its findings." It must be pointed out that these statements are without basis. In the Tax Court the question presented was whether four independent contractors had an economic interest in the coal mined on the properties of petitioner (taxpayer). The four contractors were Capparell Stripping & Construction Co., Inc., Hillside Mining Company, Big Buck Mining Company, and North Basin Coal Mining Company. With respect to the last three mentioned companies, the Tax Court found that oral agreements which they had made with the taxpayer " * * * were terminable at will," and that they were in fact terminated by the taxpayer after a period of one year or less. The Tax Court made no specific finding with respect to the question as to whether the taxpayer's written contract with the Capparell Stripping & Construction Co., Inc., was "terminable at will" by the taxpayer. However, the finding which it did make with respect to the termination of that written contract clearly discloses that the Capparell contract was not terminable at will but only for cause, i.e., bankruptcy or default by Capparell.

The instant appeal concerned only the taxpayer's right to a percentage depletion deduction with respect to the Capparell contract. The Commissioner did not appeal the depletion issue as it pertained to the contracts with Hillside, Big Buck, and North Basin.

It may be noted parenthetically that Usibelli v. Commissioner of Internal Revenue, 9 Cir., 229 F.2d 539, relied on by the taxpayer, is in complete accord with the disposition which we made in the opinion filed by the Court in this case on November 30, 1955. In Usibelli the Court pointed out that the contract there was terminable at the will of the taxpayer mine owner.

The petition for rehearing will be denied.